**278 P.2d 970**

**Samuel C. AGNEW and Margia A. Agnew, his wife, Plaintiffs-Appellees,**

**v.**

**G. V. LANDERS and Marie W. Landers, his wife, Defendants-Appellants.**

**No. 5743.**

Supreme Court of New Mexico.

Nov. 22, 1954.

Dissenting Opinion Jan. 11, 1955.

Rehearing Denied Jan. 12, 1955.

Albert R. Kool, Albuquerque, for appellants.

K. Gill Shaffer, Albuquerque, for appellees.

LUJAN, Justice.

This is an action to rescind a certain warranty deed, issued and delivered by the plaintiffs to defendants for real property known as the Casa Loma Lodge, situated in Bernalillo County, on account of alleged fraudulent representations, and to recover certain special damages.

In negotiating the sale of the Apache Lodge here involved, the defendant G. V. Landers and his agent, F. L. Pinkston, represented to the plaintiffs the following: (1) That the income from said lodge would be approximately $2,000 per month during the summer and approximately $1,200 per month during the winter; (2) that the First National Bank of Albuquerque, New Mexico, held a first mortgage on said property in the sum of $77,000; (3) that a collateral security was a better proposition than a second mortgage; (4) that W. R. Beeble was a man of considerable experience and financial means and reliable. These statements were false and fraudulent, and made for the purpose, and with the intent, of inducing plaintiffs to enter into the contract of sale. Plaintiffs believed these representations to be true, relied on them, and were induced thereby to enter a contract to purchase the property which was executed on September 20, 1949.

The case was tried to the court. It resolved the issues in favor of the plaintiffs (appellees) and the defendants (appellants) have perfected this appeal.

The defendants assign numerous errors alleged to have been committed by the trial court. Their major contentions are that (1) there is no substantial evidence to support the court's findings that defendant Landers and his agent Pinkston made false representations or fraudulently withheld facts; (2) the evidence establishes that the plaintiffs did not rely on the alleged repre-

sentations and were not entitled to rely thereon; (3) there is no substantial evidence that plaintiffs were damaged by the alleged misrepresentations; (4) the parties cannot be placed in status quo due to delay of plaintiffs in taking action to rescind after full knowledge of all facts; (5) the court's conclusions of law are not supported by its findings or substantial evidence. The defendants are confronted with the substantial evidence rule. It is a difficult obstacle in their path.

As to the income the Apache Lodge would produce the plaintiff, Samuel C. Agnew, testified as follows:

\*   \*   \*   \*   \*   \*

"Q. Did you ask Mr. Landers and Mr. Pinkston any questions concerning Apache Lodge? A. A great many.

"Q. Tell the court what you asked, and what the answers were? A. I asked about the income on the Apache Lodge, and Mr. Landers said he had only had it a few days, and that his *understanding* was that the income was around $2000.00 a month in the summer, and would drop to around $1200.00 a month in the winter, and that therefore $800.00 payments on the mortgage would not be too severe.

\*   \*   \*   \*   \*   \*

"Q. What other questions did you ask? A. I asked Mr. Landers about the books; whether I could see the books and records on the Apache Lodge, and Mr. Landers explained that Mr. Beeble had only been out there a few days, and therefore, had no records to exhibit as yet, and that the former owner, whose name I believe was Truitt had left town, and therefore no books were available for the past.

On cross-examination he testified:

\*   \*   \*   \*   \*   \*

"Q. Are you sure that if he was there at that time or any other time, the statements he made to you was that there were no books; that he had just taken over the place for a few days, and that the only thing he could say was that there were so many units and that if they were filled to capacity it would be somewhere around $2000.-00 a month? A. No, he made no representation on what the income would be if all the units were filled, or anything like that; he represented that to be the average, or the approximate average income for the warm weather and the cold weather.

"Q. Did you ask him where he got his understanding of this thing? A. I did.

"Q. What did he say? A. From the former owner.

"Q. The former owner told him that? A. Yes.

"Q. Who was that? A. I have never met the gentleman, but his name was Truitt."

The record disclosed the following income taken in by the Apache Lodge for eight months subsequent to the transaction and before the plaintiffs gained knowledge of the true state of affairs.

1949

| | |
|---|---|
| Sept. 12 days only | $684.00 (Fair week) |
| Oct. | 659.00 |
| Nov. | 495.00 |
| Dec. | 400.00 |

1950

| | |
|---|---|
| Jan. | $250.00 |
| Feb. | 247.00 |
| Mar. | 361.00 |
| Apr. | 440.00 |

As to the First National Bank of Albuquerque, New Mexico, being the holder of a first mortgage on the Apache Lodge the plaintiffs testified as follows:

"Mr. Agnew:

\*       \*       \*       \*       \*       \*

"Q. What did you tell him (Pinkston) about the proposition? A. I asked him some questions about the Apache Lodge, and he told us there was a $77,000.00 mortgage on the 'Apache Lodge, and I asked him who this mortgage was payable to, and he

told us the bank. I asked him which bank, and he told us the First National Bank.

\*       \*       \*       \*       \*       \*

"Q. What transpired in the conversation you had at that time between Mr. Pinkston, Mr. Landers and yourself? A. Mr. Landers came on down from his room, and the three of us went in Mr. Pinkston's inner office and sat down, and Mr. Landers started explaining the deal.

"Q. Tell the court what he said? A. Mr. Landers told me that the mortgage on the Apache Lodge was approximately $77,000.00, and that the man's name with whom Mr. Landers had traded was Beeble, and that he had a note from Beeble for $23,000.00.

\*       \*       \*       \*       \*       \*

"Q. Did you ask him any other questions? A. I was still interested in this mortgage of $77,000.00, and I asked Mr. Landers who that mortgage was payable to, and how it was paid. He said it was payable at the First National Bank in Albuquerque, and that the terms were $800.00 a month, including interest and principal.

\*       \*       \*       \*       \*       \*

"Q. Even though you knew there was a mortgage held at the First National Bank for $77,000.00, why did you go into a transaction with that

large a mortgage? A. I considered the First National Bank was a very reliable institution, and that I would have faith in the fact that if they had a $77,000.00 mortgage, that the property must have considerable value; and, also the fact that the bank might reduce those $800.00 payments in case Mr. Beeble had any difficulty in fulfilling his obligations.

"Q. In other words, you felt you would have the bank to deal with if there was any trouble? A. Yes."

Mrs. Agnew testified as follows:

*　　*　　*　　*　　*　　*

"Q. Do you remember whether or not any figures were mentioned at that particular time? A. There was a figure of the mortgage on the Apache Lodge which was mentioned, $77,000.00 was mentioned, yes.

"Q. Was it mentioned as a mortgage? A. Yes.

"Q. When you were in Mr. Krannawitter's office, discussing this transaction, what statement was made that the First National Bank had a $77,000.00 mortgage? Did you believe that statement, and rely upon it in the transaction? A. Yes, I believed that the First National Bank had it.

"Q. You discussed that matter many times with your husband? A. Yes. I didn't have any reason to disbelieve it."

On January 16, 1950, Mr. Agnew wrote Mr. Clyde Hill, Vice-President of The First National Bank of Albuquerque, New Mexico, a letter, the pertinent part of which reads as follows:

"Enclosed you will find a letter from Mr. Krannawitter in regard to the matter of the Apache Lodge for which your bank holds first mortgage."

On January 23, 1950, Mr. Hill replied as follows:

"After investigation, I have found that we do not have any direct or indirect interest in the $77,000.00 mortgage on the Apache Lodge."

*　　*　　*　　*　　*　　*

"Q. This letter, which you received from the bank was the first indication you had that the bank did not have a first mortgage on the Apache Lodge? A. It was.

"Q. The first time you had heard anything about it? A. Yes."

As to the representations that a collateral security was better than a second mortgage Mr. Agnew testified as follows:

"Q. Did you object to the fact that you would have a second mortgage? A. Yes, I brought up the fact that although I had very little dealings in real estate, that I had always understood that a second or third mortgage was greatly inferior to a first mortgage, and

I made some objection to the fact that it seemed that I was getting a second mortgage.

"Q. What was said in answer to that? A. Mr. Landers and Mr. Pinkston both assured me that it was not in reality a second mortgage; that it was collateral security; that in this deal I would be secured by an absolute holding on the Apache Lodge.

"Q. Did they say whether that was better or worse than a second mortgage? A. They represented that it was better. Mr. Landers said he didn't like to fool with second mortgages himself, but a collateral security was a better business proposition than a second mortgage."

As to the representations that W. R. Beeble was an experienced auto court operator, a man of financial means and reliable, Mr. Agnew testified:

\*　　\*　　\*　　\*　　\*　　\*

"Q. After you had finished discussing the mortgage, did you ask Mr. Landers any questions concerning Mr. Beeble? A. Yes, I wanted to know what kind of man Mr. Beeble was, where he came from, and what his occupation was?

"Q. What was the answer to those questions? A. Mr. Landers told me that Mr. Beeble, first of all, was a tourist court owner in Amarillo, or had

been, and that as such, he was experienced in the running and operation of tourist courts and would therefore have an advantage in this new venture in the Apache Lodge; he would have an advantage since he already had experience, and that Mr. Beeble was a man, in addition to that, of considerable financial means; that he had property in and around Amarillo, and he mentioned specifically that he had other ranch property situated outside Amarillo.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Tell us about that discussion? A. I asked him if he didn't think there should be some principal payments made on the $23,000.00 note; that the way it seemed to me was that the note could run to the last day of the five years and the whole $23,000.00 would fall due, and would make a terrific load for any one to pay, and Mr. Pinkston said he understood that Mr. Beeble was going to sell some of his property that he had in Amarillo, and was going to try to pay on the principal and interest on that note as quick as possible."

\*　　\*　　\*　　\*　　\*　　\*

Mrs. Agnew testified as follows:

"Q. Was there any discussion at that time concerning the income from the Apache Lodge, or the financial abil-

ity of Mr. Beeble? A. There was no discussion of the income. It was said that Mr. Beeble was a man of financial responsibility.

"Q. Who said that? A. That was told to Mr. Agnew and myself the first day Mr. Pinkston was out to the house, I believe.

"Q. Mr. Pinkston told you that at Casa Loma Lodge? A. Yes. He didn't say that Mr. Beeble was a man of financial responsibility then; he didn't mention his name. He said this man that Mr. Landers made the deal with, from Amarillo, was a man of responsible means."

As to the concealment of important facts concerning the true situation of the Apache Lodge, Mr. Agnew testified as follows:

\*　　\*　　\*　　\*　　\*　　\*

"Q. Now, Mr. Agnew, up until this time, had anything been mentioned to you by either Mr. Landers or Mr. Pinkston concerning a Reconstruction Finance Corporation loan on this property? A. No, sir.

"Q. Or had anything been told you about Mr. Caldwell being the owner of this property? A. No, sir; I never had heard his name.

"Q. Had anything been mentioned to you concerning a contract between a Mr. Caldwell and a Mr. David? A. No.

"Q. Or a contract between Mr. David and Mrs. Melbourne? A. No, sir.

"Q. Was anything mentioned that the interest of the Davids and the Melbournes had been purchased by a woman by the name of Motto? A. No.

"Q. Nothing was mentioned at all? A. That is correct.

\*　　\*　　\*　　\*　　\*　　\*

"Q. If you had known there was an RFC loan, and these various contracts I have mentioned, in existence against this property, would you have gone into the transaction? A. I would not."

It was understood by both parties that upon the conveyance of the Casa Loma Lodge to defendant Landers he would endorse the $23,000 Beeble note held by him to the said Agnew and also assign the collateral security thereto. What transpired at the time the deal was closed is better reflected by the testimony of Mr. and Mrs. Agnew.

Mr. Agnew testified:

\*　　\*　　\*　　\*　　\*　　\*

"Q. Up until this time what was your understanding concerning the indebtedness of Mr. Beeble? Would it be endorsed to you, or what was going to be done with that indebtedness? A. I understood the note from Mr. Beeble

to Mr. Landers would be endorsed over to me.

"Q. That was told you by Mr. Landers? A. Yes.

\*     \*     \*     \*     \*     \*

"Q. Later, a few days thereafter, did you go back to Mr. Krannawitter's office? A. Yes, I believe it was the next day, or a couple of days afterward.

"Q. What happened at that time? A. Mr. Krannawitter had some additional papers which he said that in the rush of the previous day, or I believe it was the next day, in the rush of the previous day, that he had forgotten to give to me to sign.

"Q. Did he explain to you what those papers were? A. Yes, he showed them to me.

"Q. What were the papers? A. I believe they would be a non-recourse note; no recourse.

"Q. Did you understand what that was? A. They were to the effect that Mr. Beeble's note had been turned over to me, and that the deal had been completed on Casa Loma Lodge, and that in case of any default by Mr. Beeble, I would have no recourse to Mr. Landers. I believe that is it.

"Q. That was explained to you by Mr. Krannawitter? A. Yes. They

were all written out when I got up there."

Mrs. Agnew testified as follows:

\*     \*     \*     \*     \*     \*

"Q. Was there any discussion about changing the note to a direct note from Mr. Beeble to Mr. Agnew, in your presence? A. Yes, there was. That was after Mr. Beeble arrived; that was when he took the note or promise to pay, out of his pocket and destroyed that.

"The Court: (To Witness) Mr. Beeble did? A. Yes. Then there was another contract drawn up, straight from Mr. Beeble to my husband. The reason, Mr. Krannawitter said at that time, was to dispense with all the extra paper work, and confusion."

As to the reliance placed upon the representations made to him by the defendant Landers and his agent Pinkston, Mr. Agnew testified as follows:

\*     \*     \*     \*     \*     \*

"Q. When you signed that agreement, Mr. Agnew, in signing that agreement did you rely upon the representations that had been made to you by Mr. Landers and Mr. Pinkston? A. I certainly did.

"Q. As to the financial responsibility of Mr. Beeble? A. Yes.

"Q. As to the first mortgage at the First National Bank? A. Yes.

"Q. As to the income from the property? A. Yes, sir.

"Q. You relied upon all those things? A. Yes.

*    *    *    *    *    *

"Q. If those representations had not been made as they were, would you have entered into the transaction at that time? A. I certainly would not."

At the conclusion of the trial the court found several findings of fact, among them the following:

"1. That on the 1st day of August, 1949, Plaintiffs were the owners of a certain property located in the Sandia Mountains in Bernalillo County, New Mexico, commonly known as Casa Loma Lodge in Cedar Crest, New Mexico, and more fully described in the Complaint.

"2. That the aforesaid real estate owned by Plaintiffs was offered to the Defendants, G. V. Landers and Marie W. Landers, at and for the sum of Twenty-five Thousand Five Hundred Dollars ($25,500.00).

"3. That it was represented by the Defendant, G. V. Landers, and his agent, Pinkston, to the Plaintiffs that one W. R. Beeble was the purchaser of the property known as the Apache Lodge in Bernalillo County, New Mexico, and that G. V. Landers would pay to the Plaintiff the sum of $2,500.00 chas and would arrange for a transfer of certain indebtedness from said W. R. Beeble, represented to be owing to the said G. V. Landers to the Plaintiffs herein as collateral security for the payment of $23,000.00.

"4. That the Defendant Landers and the agent Pinkston, in the presence of Landers, made certain representations which were false representations as follows:

"a. That the income realized from the Apache Lodge was $2,000.00 per month during the summer months, and $1,200.00 per month during the winter months.

"b. That W. R. Beeble was an experienced auto court operator, was a man of considerable means and was reliable.

"c. That an assignment of collateral security from Beeble to Plaintiff Agnew would be more effective security for Agnew than would a second mortgage.

"5. That the defendant Landers, and the agent Pinkston, fraudulently withheld from the Plaintiffs the fact that the title to the Apache Lodge was

in a confused state, and that there were, at said time, a number of installment land contracts pyramided on it, and that if such facts had been made known to Plaintiffs, the sale of Casa Loma Lodge would not have been made.

"6. That the state of the title to Apache Lodge, at the time Plaintiffs took the collateral assignment from Beeble, was substantially as follows:

"A. Mortgage to Albuquerque National Bank in original amount of $25,-000.00; balance as of November 30, 1951, $11,457.85, payable out of contract payments as hereinafter described.

"B. On October 7, 1948, the original owners, E. J. Mankin and wife, sold to L. O. David and wife on real estate contract, and the Davids then assigned their interest as purchasers to Chattie Melbourne and S. Melbourne, with consent of owners.

"C. The original owners, Mankin, February 8, 1949, sold all their interest to B. L. Caldwell and Evelyn Caldwell, subject to purchasers equity.

"D. On April 26, 1949, the Melbournes sold their equity under separate real estate contract to Paul Truitt and wife, and thereafter the Melbournes, as owners under this contract, assigned all their interest to Sytha Motto and husband.

"E. At this point the interest of the Mankins, Davids and Melbournes had been extinguished; Caldwell being the record owner and Motto and Truitt having interests under real estate Contracts.

"F. On September 20, 1949, Truitt sold the property under separate real estate contracts to Beeble, which was the contract upon which Beeble executed the collateral assignment, Plaintiffs' Exhibit D, to Plaintiffs.

"7. That in reliance upon such false representations the Plaintiff Agnew deeded the property above-described to G. V. Landers and his wife, on the 22nd day of September, 1949; that the said W. R. Beeble made and delivered to Samuel C. Agnew his certain promissory note in the sum of $23,000.00, and also executed a certain instrument entitled "Assignment of Contract as Collateral Security."

"9. That the appraised valuation of the property at the time of trial was $26,000.00; that the Defendants had certain improvements and repairs to the property which enhanced the valuation of the premises in the sum of $5,000.00; that such improvements were in the main and substantially done after the filing of the complaint, and the service of the same upon the Defendants herein."

The Court concluded:

"1. There is such an inadequacy of consideration received by the Plaintiffs as to shock the conscience of the Court.

"2. That the false representations made to Plaintiffs by the Defendants and their agent as to material elements of said transaction, and the deliberate withholding of material facts by the Defendants and their agent, are such as to vitiate the conveyance by the Plaintiffs to the Defendants, of the premises described in the Complaint."

The Court made the above findings of fact based on its belief in the testimony of the plaintiffs. We are bound by the trial court's findings of fact when supported by substantial evidence. Taylor v. Sarracino, 44 N.M. 469, 104 P.2d 742.

In substance the trial court found four separate false representations which were made by defendants; they are: (1) As to monthly income from the Apache Lodge; (2) as to the financial status and business experience of W. R. Beeble; (3) as to the comparative worth as security of a collateral assignment of real estate contract and of a second mortgage; and (4) by fraudulently concealing the true state of the title which consisted of a multitude of pyramided executory sales contracts upon which a total indebtedness of

$77,000 was due to several different creditors instead of a single mortgage approximating $77,000 held by a single creditor, First National Bank in Albuquerque. The trial court based its judgment upon all of these alleged false representations.

In our judgment, for reasons which we shall state briefly, the findings as to the first three of these representations will not suffice to sustain the judgment.

The first representations as to monthly income was clearly stated by defendants as constituting their understanding of the facts from the prior operators of the Apache Lodge. The testimony is explicit to the effect that defendants never operated the lodge nor saw the books. Plaintiffs had no right to accept these statements as representations of facts known to defendants when defendants clearly disclosed the source and reliability of the facts stated. Hartzell v. Jackson, 1937, 41 N.M. 700, 73 P.2d 820. The second representation as to the financial status and experience of Beeble is not actionable as fraud because it is unsupported by any substantial evidence. At no point in the record was there any evidence that Beeble was not financially strong and was not an experienced operator of tourist courts. With reference to the third misrepresentation concerning the comparative value as security of a second mortgage and of an assignment of a real estate contract, the au-

thorities seem reasonably uniform to the effect that a misrepresentation of the law cannot constitute actionable fraud. This conclusion is sometimes based upon the theory that fraud cannot be predicated upon the expression of an opinion. We feel that this representation in the instant case is not actionable. 37 C.J.S., Fraud, § 55, Representations of Law, page 323.

■ Findings of fact 5 and 6 of the trial court cover the fourth misrepresentation upon which the trial court relied. It is comprised of a concealment by defendants of the true and confused state of the title of the Apache Lodge and the specific misrepresentation of an existing fact, namely, that the indebtedness of $77,000 against this property was represented by a mortgage in the amount held by the First National Bank. We quote again a question and answer made at trial in this connection. Mr. Agnew was the witness:

"Q. Even though you knew there was a mortgage held at the First National Bank for $77,000.00, why did you go into a transaction with that large a mortgage? A. I considered the First National Bank was a very reliable institution, and that I would have faith in the fact that if they had a $77,000.00 mortgage, that the property must have considerable value; and, also the fact that the bank might reduce those $800.00 payments in case

Mr. Beeble had any difficulty in fulfilling his obligations."

In this fourth misrepresentation we find actionable fraud which will sustain the judgment of the trial court. It is true that there is no testimony as to the actual value of the Apache Lodge; however, aside from the question of whether or not $77,000 was more than the First National Bank would have loaned on this property, Mr. Agnew from this fact would be entitled to assume that the status of the security for a loan of that size would be carefully examined by the banking institution prior to the consummation of a loan; he was further entitled to assume that in the event of financial tightness in meeting the $800 monthly payments on this note and mortgage, he would have but one person or institution with which to negotiate for time or for a reduction in installments.

The testimony is clear that plaintiffs relied upon this misrepresented fact in consummating their trade. The good faith of plaintiffs in their reliance is established by their letter of January 16, 1950 addressed to the vice-president of the bank asking for information concerning the mortgage, which letter was answered on January 23, 1950 by the vice-president, as heretofore quoted in this opinion.

It seems difficult to question the fact that plaintiffs suffered severe damages which flowed at least in part from this misrepre-

sentation. The literal result of this transaction was that plaintiffs gave to Landers a $25,000 piece of property and received for it from Landers $2,500.

■ The greatest obstacle in the way of recovery for plaintiffs in this case is the contention made by defendants that plaintiffs' delay in exercising their right of rescission deprives them of that right, both on the theory that they affirmed the transaction after knowledge of the fraud and that, by their delay, it became impossible for them to place defendants in status quo.

It is true that the suit seeking rescission was not filed until July 20, 1950, even though they were apprised of the non-existence of the first mortgage at the First National Bank by the vice-president's letter of January 23, 1950. This Court, in Putney v. Schmidt, 1911, 16 N.M. 400, 120 P. 720, resolved similar questions in favor of the position taken by defendants. However, we do not deem that case controlling here for the following reasons. By the time the Agnews received this information, they had left New Mexico and were concerned with affairs outside of this state; under the terms of the collateral assignment of the contract on the Apache Lodge, the plaintiffs had no right to take over the Apache property until there was a default on the $23,000 note from Beeble to Agnew. No such default occurred until March; the misrepresentations of fact made in this case by their very nature placed plaintiffs in a position so complex and so difficult to evaluate that the time required by them to return to New Mexico, employ counsel and explore the possibilities of salvaging this transaction cannot be deemed an inordinate delay in the exercise of their right to rescission.

■ Nor can the defendant Landers protest that this delay has prevented plaintiffs from returning him to status quo. In Brown v. Norman, 65 Miss. 369, 4 So. 293, 297, the court said:

\* \* \* \* \* \*

"Upon principle and authority we think it immaterial that the status quo cannot be literally restored. The defendant, by the grossest fraud, seduced complainant to exchange his farm for mere moonshine. What he professed to give was in fact of no value to himself or to any one else. \* \* \* By his own act, therefore, a restoration of the status quo was made impossible."

The defendant Landers insisted, contrary to his original agreement, that he be not required to endorse the $23,000 note from Beeble to himself and that the collateral assignment run direct from Beeble to plaintiffs; in short, to the greatest possible extent he insulated himself and his own financial responsibility from jeopardy. Having done so, we cannot recognize his

protest that he was not allowed to again become a principal in the transaction for the purchase of Apache Lodge. Further, the record reveals that the $23,000 promissory note from Beeble to Agnew still rests as a collection item in the hands of the First National Bank in Albuquerque. To this note, endorsed to defendants without recourse on plaintiffs, the defendants are entitled for the purpose of returning them to their status quo insofar as this is possible.

On condition that plaintiffs procure and deliver to defendant Landers the promissory note for $23,000 properly endorsed by them without recourse to the said Landers, or in the alternative, on condition that they deliver said note so endorsed to the clerk of the district court for the use of Landers, the judgment of the trial court is affirmed. In the event of the failure of plaintiffs to comply with this condition, the judgment of the trial court is reversed with direction to the trial court to take such further action as is necessary to determine the fate and disposition made of this $23,000 note and make such other disposition of said case on the merits as is proper and not in conflict with the views expressed herein.

It is so ordered.

COMPTON and SEYMOUR, JJ., concur.

SADLER, J., concurs in the result.

McGHEE, J., dissents.

McGHEE, Justice (dissenting).

Because of changes made in the majority opinion after I submitted my dissent, changes of which I was not advised, my former dissent is withdrawn and the following substituted therefor:

What appears to be a statement of facts in the second paragraph of the majority opinion is, in fact, a summary of allegations in the complaint.

No finding was made or requested by the plaintiffs regarding the existence of a supposed mortgage to the First National Bank of Albuquerque, and the majority opinion correctly holds the findings on the other allegations above referred to could not, under the record in the case, sustain the decree of rescission.

The only material finding of fact left is number 6 set out in the majority opinion. True, the majority hang on a statement there was a false representation that the only indebtedness against the property was a $77,000 mortgage to the First National Bank of Albuquerque, but there is no finding of fact to support it, and none was requested.

Thus, only the claimed concealment of the pyramided contracts remains to support the decree, and the finding of concealment of the contract from Truitt to Beeble dated

September 20, 1949, must be eliminated, as it was the one assigned by Beeble to Agnew, and read by the latter. Agnew also testified that he knew Beeble was paying on a contract with Truitt. Evidently Agnew did not believe he had been induced to enter into the contract by any representations as to a mortgage at the bank or the concealment of the pyramided contracts, or else felt he had not proved such fact, for when he filed his requested findings of fact and conclusions of law approximately 23 months after the close of the trial, his requests as to the claimed false representations which induced him to enter into the contract read:

"V.

"That the defendant Landers and the agent Pinkston, in the presence of Landers, made certain representations which were false representations as follows:

"a. That the income realized from the Apache Lodge was $2,000.00 per month during the summer months and $1,200.00 per month during the winter months.

"b. That W. R. Beeble was an experienced auto court operator, was a man of considerable means and was reliable.

"c. That an assignment of collateral security from Beeble to plaintiff Agnew

would be more effective security for Agnew than would a second mortgage."

In the next paragraph he asked the trial court to find:

"That in reliance upon such false representations the plaintiff Agnew deeded the property * * *".

I agree with Agnew that he had not established a claim he was deceived by representations as to the contracts and mortgage.

But, even if it be conceded Agnew had a right to rescind at one time, he still is not entitled to a decree of rescission because of his delay in acting.

He knew in January before filing the complaint in July that the First National Bank did not have a $77,000 mortgage; in March preceding the filing of complaint he knew in detail about the sales contracts, if he did not in fact know about them previously. He also knew in March that Beeble was not keeping up the payments and visited with him about the matter; he had his attorney contact Mrs. Motto who held the No. 1 contract in an unsuccessful effort to get her to reduce the payments. When in April Mrs. Motto gave notice that she would take back the property in accordance with her contract unless the default was cured within thirty days, the Agnews were promptly advised of such fact. Instead of then rescinding and thus allowing

Landers to step in and protect himself, Agnew did nothing until in July, when the property had been irretrievably lost in May.

Apparently the only New Mexico case treating this problem directly is that of Putney v. Schmidt, 1911, 16 N.M. 400, 120 P. 720, 723, where it is said:

"It is not disputed that where a party received something of value under a contract, if he seeks to rescind the same upon the ground of fraud, he must immediately, upon discovering the fraud, restore, or offer to restore, all that he has received under the contract, as a condition precedent to his right to rescind the same. If he fails to do this, or if, after discovering the fraud, he takes any steps in affirmance of the contract, he will be held to have elected to affirm the same and will not thereafter be granted relief in equity from the burdens of the contract. * * *"

The Restatement, Restitution, § 64, p. 248 states:

"An unreasonable delay in manifesting an avoidance of a transaction after the acquisition of knowledge of the facts terminates the power of rescission for fraud or mistake, and the consequent right to restitution, if the interests of the transferee or of a third person are harmed or were likely to be harmed by such delay."

In the Restatement illustrations to this section appears the following:

"9. A, induced thereto by B's misrepresentation as to the geological formation of the land, purchases from B leases upon undeveloped oil lands. After discovery of B's misrepresentations A does nothing for six months, during which time the value of such oil lands has been rapidly fluctuating over a wide price range. A is not thereafter entitled to restitution." (p. 253)

To the same effect is 2 Black on Rescission and Cancellation, (2d Ed.) § 536, pp. 1316, 1320, 1321:

"One possessing the right to rescind a contract on the ground of fraud, mistake, or other sufficient cause, and desiring to exercise such right, must not be guilty of any unreasonable or unnecessary delay in the assertion of his purpose and in taking steps to make it effective, or he will be denied relief in equity on the ground that such delay is tantamount to a waiver of his objections to the contract, or is a manifestation of his election to affirm it rather than to repudiate it. * * * The true doctrine is that, after discovering the facts justifying rescission, the party is entitled to a reasonable time in which to decide upon the course he will take. But this does not mean that he will be indulged in a

vacillating or hesitating course of conduct, but that he must act with such a measure of promptness as can fairly be called 'reasonable' with reference to all the circumstances of the particular case. Particularly, he must, if possible, avoid such a delay as will make the ensuing rescission injurious to the other party or to the intervening interests of third persons. * * *"
See also, 12 Am.Jur. (Contracts) § 447; 24 Am.Jur. (Fraud and Deceit) § 208; and 17 C.J.S., Contracts, §§ 431, 432a.

The only authority cited by the majority in support of their opinion is an excerpt from Brown v. Norman, 1888, 65 Miss. 369, 4 So. 293, but the facts in that case and this one are entirely different. That case was before the court on a complaint and demurrer. It was alleged the defendant induced the plaintiff to trade his farm at a value of $3,100 plus $500 in cash for a third interest in a partnership, the assets of which were $5,000 and its indebtedness was $12,000; that it was represented the firm was in a solvent and prosperous condition and that a false statement of its assets and liabilities had been furnished for his inspection; that the false representations and trade were made in October, 1885, and the firm and business was placed in receivership the following March at the request of one of the partners; that the plaintiff did not learn of the facts until shortly before the business was placed in receivership.

Truly, what the plaintiff in that case received could not be classed as more than moonshine, but an additional reason was given for holding the complaint good on demurrer—that when the defendant sold his interest in the partnership he was no longer a partner, and he could not have been re-admitted to partnership without the consent of the two remaining partners.

In this case there is not a word of testimony that the Apache Lodge was not worth everything there was against it—no such claim that I can find is made by the Agnews. The Apache Lodge had 18 rental units, plus living quarters, was reasonably new and the tract of land was 250 yards in length and 96 yards in width, less some conveyed to the county evidently for right of way; also, it was located on Highway 66 immediately west of Albuquerque.

Brown v. Norman, supra, except for the lifting of some comforting words for the hard pressed majority is not authority for excusing the delay in this case.

I dissent.

## On Motion For Rehearing

LUJAN, Justice.

The defendants have moved for rehearing. We have carefully examined the mo-

tion as well as the briefs supporting it and find nothing to persuade us the opinion on file announces a wrong result. It may be well, however, to emphasize one or two factors so much relied upon as establishing error in the opinion filed.

It is said there is no specific finding of the representation relative to a $77,000 mortgage held by First National Bank in Albuquerque. True enough, but the mortgage of the bank in the amount mentioned was but one element or factor in the confused state of title, made up of a sizeable number of pyramided purchase contracts held at varying times in the chain of title by sundry persons, knowledge whereof was fraudulently concealed from the plaintiffs, as set out in the findings and expressly found by the court.

Furthermore, but for Landers' unseemly solicitude to completely erase his name and all prospect of liability from the transaction with Agnew, as evidenced by substitution of a "no recourse" endorsement on the Beeble note and the securing of an assignment of Beeble's contract directly to Agnew by Beeble leaving him, Landers, completely out of the picture, he might reasonably have expected notice from Mrs. Motto along with all others in the chain of title down to himself, thereby giving him the opportunity, now seemingly so much coveted, to step in and save the purchase contract. In other words, in his overzealous effort to insulate himself against all possible future liability in connection with the matter, he "insulated" himself out of the right to notice of default, which he now says or claims would have given him an opportunity to save himself.

The record abounds in proof of a gross fraud on plaintiffs. If the $23,000 note he "hawked" to Agnew has any value, he gets it back. If it is worthless he still gets it back.

The motion for rehearing will be denied.

It is so ordered.

COMPTON, C. J., and SADLER, J., concur.

KIKER, J., not participating.

McGHEE, Justice (dissenting).

The majority opinion on the motion for a rehearing states the record abounds with fraud on the part of Landers, which makes me wonder why the majority vacated findings of actionable fraud which Agnew said caused him to enter into the contract, as reflected by his complaint and requested findings of fact set out in my dissent to the original opinion.

The motion for rehearing should be granted and the judgment reversed. I therefore dissent.