**F. G. KINGSLEY et al., Appellants,**

v.

**WESTERN NATURAL GAS COMPANY
et al., Appellees.**

No. 14498.

Court of Civil Appeals of Texas.

Houston.

June 24, 1965.

Rehearing Denied Sept. 9, 1965.

Childress, Port & Crady, Virgil Childress, Houston, Wood, Boykin & Wolter, Ralph R. Wood and Marshall Boykin, III, Corpus Christi, for appellants.

Liddell, Austin, Dawson & Sapp, Dwight H. Austin and Willis Witt, Houston, for Western Natural Gas Co.

George Wear, Fort Worth, for Continental Oil Co.

WERLEIN, Justice.

This suit was brought by appellants, F. G. Kingsley and Roger Milliken, for damages allegedly resulting from breach of an implied covenant by appellees, Western Natural Gas Company and Continental Oil Company, hereinafter sometimes called "Western" and "Continental", to take gas from the well and leases of appellants and their co-owner, ratably with the quantities of gas taken from the wells and leases of Reynolds Metal Company, and Reynolds Mining Corporation, hereinafter referred to jointly as "Reynolds", all such gas being produced from the Common A–2 Reservoir in the Lamar Field area in Aransas County, Texas. Appellants' gas was purchased and/or taken by Western and Continental during the period August 1, 1957 to June 1, 1960 under a written contract dated March 13, 1953 between Burdette Graham and H. C. Heldenfels, appellants' predecessors in title, et al, as "Seller" and Western and Continental as "Buyer."

At the conclusion of the evidence the trial court on appellees' motion withdrew the case from the jury and entered judgment that appellants take nothing. From such judgment appellants have perfected their appeal.

In their first group of points appellants contend in substance that the trial court erred in holding that under said Burdette Graham contract, by the terms of which Buyer agreed to purchase or take the gas from all of appellants' properties in the Lamar Field in Aransas County, appellees as a matter of law, did not impliedly covenant and were not impliedly obligated to take gas ratably upon a reasonable allocation formula from appellants' well and leases with the quantities of gas produced and/or take from the wells of Reynolds produced from the same common reservoir; and in holding that, as a matter of law, appellees had not breached such im-

plied covenant by taking during said period of time from the wells and leases of Reynolds with a total of allocated productive acreage, as located by Reynolds, of only 51.-5341 acres with actual productive acreage of only 29.9268 acres, 3,938,610,000 cubic feet of gas while taking during the same period from said common reservoir only 1,145,058,000 cubic feet of gas produced from said common reservoir from appellants' Coloma Heard Unit No. 1-c Well with productive acreage of 143 acres allocated to it by appellants' operator, Coloma Well & Gas Corporation, sometimes called herein "Coloma", which corporation appellants wholly owned, with actual productive acreage of 175.51 acres, to appellants' damage in the sum of $287,314.58.

In their Fourth Amended Original Petition, the trial petition, appellants alleged that they were the owners of an undivided ⅔rds interest in certain oil, gas and mineral leases covering 253.2 acres of land, which they described, and a corresponding interest in all gas, including condensate produced from or underlying said leases; that their interest in said leases and wells were operated for them and their co-owner of the remaining ⅓rd interest by Coloma, and that said leases were located partly in the Lamar Field and partly in the Fulton Beach Field as the limits of such fields are defined respectively by the Railroad Commission of Texas. Appellants further alleged that their interest in such leases and all production therefrom was acquired on August 1, 1957, subject to that certain gas sales contract dated March 13, 1953 by and between Burdette Graham, H. C. Heldenfels, trustee, and Pratt-Hewitt Oil Corporation, as "Seller" and appellees as "Buyer", and that appellants acquired as of August 1, 1957 all of the Seller's rights under said gas sales contract. They also alleged that under such contract Seller agreed to sell and deliver to Buyer and Buyer agreed to purchase, take and receive from Seller the gas produced from Seller's leases for the term March 13, 1953 to

September 12, 1972, a period of more than 19 years.

The contract in question, referred to herein as Graham or Burdette Graham contract, executed on March 13, 1953, by appellants' predecessors in title and under which appellants acquired all rights on August 1, 1957, contains the following pertinent provisions which must be considered in determining whether or not there was an implied covenant inherent in such contract to take gas ratably as contended by appellants.

Article I, Sec. 1 of said contract provides that the Seller agrees to sell and deliver to Buyer and Buyer agrees to purchase and receive from Seller the gas produced from all of the Seller's properties in the Lamar Field in Aransas County, Texas. Section 2 of such Article provides in substance that during each billing period during the term of the contract the Seller shall sell and deliver to Buyer and Buyer shall purchase and receive from Seller a quantity of gas at least equal to 1,000,000 cubic feet per day multiplied by the number of wells covered by the agreement on the first day of the billing period; "provided, however, that Buyer shall not be obligated to pay for any gas which is not tendered to Buyer by Seller." Buyer shall have the right, at its option, to purchase and receive additional quantities of gas up to but not exceeding that quantity each day which the wells then covered by the agreement can lawfully produce, less 1,000,000 cubic feet per well. Seller's delivery obligations shall be subject to the ability of Seller's wells to lawfully produce when operated in accordance with sound field practice.

Article II, Section 5, provides in substance that the gas covered by the agreement shall be delivered by Seller to Buyer or for Buyer's account into the pipeline owned and operated by St. Charles Pipeline Company, which pipeline runs from the St. Charles Field in Aransas County, Texas, to the aluminum plant owned and operated by Reynolds in San Patricio County, Texas.

The points of delivery on said pipeline shall be determined by agreement among Buyer, Seller and St. Charles Pipeline Company.

Article III, Sec. 1, provides in part that the Seller shall, at its sole cost and expense, construct, own, operate and maintain all gathering lines, pipelines, meter stations and other equipment necessary in order to deliver to the delivery points the gas covered by the agreement and to measure the quantities thereof for billing purposes.

Article VI, Sec. 1, of said contract provides in substance for a minimum take based upon a restudy of reserves at the option of either party not oftener than once every five years during the term of the contract. The provisions of this Section were never invoked by appellants or by appellees. For this reason appellants allege that such provisions are immaterial to the issues involved in this suit. Appellees, on the other hand, contend that such provisions are quite material in determining the intention of the parties and whether any implied covenant to take ratably exists by virtue of the provisions of the contract.

Article VII, Sec. (c), provides:

"The control, management and operation of the properties subject to this contract shall be and remain the exclusive right of Seller. Seller may, in its sole uncontrolled discretion and as it deems advisable, drill new wells, repair or rework old wells, renew or extend in whole or in part any lease or unit, and abandon any well or surrender, terminate or release all or any part of any lease not deemed by Seller capable under normal production methods of producing gas in paying or commercial quantities."

Article X, Sec. 2, reads as follows:

"It is understood that Buyer has made arrangements for the gas to be purchased by Buyer from Seller under the provisions of this agreement to be delivered and sold to Reynolds Metals Company under the provisions of a certain contract between Buyer and Reynolds Metals Company, dated January 13, 1951, and that Buyer presently has no other market for said gas. Accordingly, any provision of this agreement to the contrary notwithstanding, the quantities of gas to be purchased by Buyer from Seller from time to time under the provisions of this agreement shall not, without Buyer's consent, exceed the quantities of gas actually delivered from time to time under Buyer's said contract with Reynolds Metals Company, less the quantities of gas heretofore contracted to be purchased by Buyer from time to time from other—— for delivery under the said contract with Reynolds Metals Company and so delivered."

Appellees assert, and the court impliedly found and concluded, that the provisions of the contract in question defined the obligations of Buyer with respect to the taking of gas, and that therefore there was no implied covenant on the part of the Buyer to take ratably gas from the wells and leases of appellants and gas from the wells of Reynolds produced from the same common reservoir.

The principal question for determination is whether under the provisions of the Graham contract there was an implied covenant on the part of the Buyer to take gas ratably from appellants' wells and Reynolds' wells, produced from the same common reservoir, even though the contract expressly obligated Buyer to purchase only one million cubic feet of gas per day per well, with the option to take in excess of such quantity. The parties stipulated that "During the period from August 1, 1957 to June 1, 1960, Western-Continental fully performed and fully complied with all obligations imposed upon them by the express (written) terms of the Burdette Graham contract, including, without limitation, the gas purchase obligations imposed on them in Article I of such contract." It is appellees' contention that there can be no

implied covenant to take gas ratably for the reason the contract provides expressly and specifically with respect to the gas that the Buyer was required to take. We have not found nor been cited to any case directly in point. The general rule is that there can be no implied covenant with respect to the exploration and development of mining properties when there are express covenants in the lease or grant specifically covering the matter.

In Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W. 2d 1039, several tracts of land were conveyed for development and operation for sulphur with provision for the payment of royalty to the grantors. The deeds and a contract expressly provided that the grantees should within a certain time erect and put in operation on the land a complete plant of one unit in accordance with a certain process. The plant was built within the time specified and other plants were later erected and put in operation, four in all, as the demands of the market required. The owner of the royalty sued for damages for the failure of the grantees and their assigns to develop and operate the sulphur mines in good faith and with reasonable diligence, the plaintiff contending that there was an implied covenant for the full development of the property. It was held that no implied covenant for the full and general development of the property existed "for the reason that the provision * * * for the erection of a one-unit plant was an express provision for development, and negatives an implication for development." The court held, however, that the provision in the contract for the erection and operation of a complete plant of one unit carried with it a very necessary implication for continued operation of such plant for the purposes of the contract regarding royalties to be paid.

In Gulf Production Co. v. Kishi, Tex. Com.App.1937, 129 Tex. 487, 103 S.W.2d 965, the oil and gas leases expressly provided for the time for drilling oil wells and the number of wells to be drilled upon the leased premises. Suit was brought by the lessors on the ground that the lessees had not used reasonable diligence to develop the premises, and that despite the provision as to the number of wells that should be drilled there was an implied covenant on the part of the lessees to further develop the property and drill additional wells. The court held that a covenant for reasonable development of land leased for the purpose of producing oil and gas is always implied and always exists unless there is in the lease an express agreement that the lessee shall not use reasonable diligence to develop the premises or an express stipulation or covenant so absolutely irreconcilable with the implied covenant as to destroy it. The court said:

"The true rule is that the implied covenant arises only out of necessity and in the absence of an express stipulation with respect to development of the leased premises. When the parties have not exercised their right to make express provision for the development of the land after production is obtained, a covenant for reasonable development is implied in order that the purpose for which the lease is made, the production of oil and gas with payment of royalty to the lessor, may be accomplished."

The court held that the parties expressed in the lease their agreements and intentions as to the number of wells required to be drilled by the lessee in the development of the premises covered by the two leases, and as to the time when the wells should be drilled, and that this being true there was no necessity for the implication of a covenant for development with reasonable diligence, and that to imply such covenant would be to make an agreement for the parties upon a subject about which they had in their written contracts expressly agreed. The court said: "Thus the parties expressly contracted with respect to the drilling of wells for exploration and there was no field for the operation of an implied agreement for the beginning of an exploratory well

or wells." The court further said: "It follows that the existence of an implied covenant for development is not to be assumed and that it becomes necessary first to examine the leases under consideration to ascertain whether the parties have expressly agreed or stipulated as to the number of wells to be drilled in the development of the premises."

The following statement from Mills & Willingham's Law of Oil & Gas with respect to reasonable development, Section 108, page 154, was quoted by the court with approval in Gulf Production Co. v. Kishi, supra:

" 'It is seldom that a lease provides for the number or the depth of the wells that shall be drilled after discovery of oil or gas in paying quantities. When it does, however, the express covenant is binding upon the question of diligence of operation and no further covenant will be implied, in the absence of drainage.' "

In the instant case the parties stipulated that appellants (plaintiffs below) do not and will not assert or contend that any well or lease mentioned in their petition, or any reservoir underlying it, was drained or damaged by virtue of the quantities of gas produced from the five Reynolds wells, and thereafter transported by appellees in the St. Charles pipeline to Reynolds. In Foster v. Atlantic Refining Company, 5 Cir. 1964, 329 F.2d 485, the lease provided for an offset well when a well was drilled within 650 feet of the Foster lease. The Fosters contended that they were entitled to two offset wells to prevent drainage. The court held that because of the express agreement on offset obligations, it would not imply any different offset obligations. The court further held that obligations to develop reasonably and to drill offset wells, whether they be expressed or implied, are two separate matters.

It is appellants' contention that appellees were under an implied duty to take the gas from their one well ratably with the gas from the five wells of Reynolds, although the Graham contract contains an express provision with respect to the gas which the Buyer was obligated to take. The law is well settled that where a contract contains an express covenant upon a subject, no implied covenant can exist as to the same subject. Simms Oil Co. v. Flewellen, Tex.Com.App.1941, 138 Tex. 63, 156 S.W.2d 521, opinion adopted by Supreme Court; Freeport Sulphur Co. v. American Sulphur Royalty Co., supra; Foster v. Atlantic Refining Co., supra; Gulf Production Co. v. Kishi, supra; Crawford v. Thomas, Tex.Civ.App., 229 S.W.2d 80, writ ref. The court, in Danciger Oil & Refining Co. of Texas v. Powell, 1941, 137 Tex. 484, 154 S.W.2d 632, in refusing to imply a covenant to develop, said:

"In the outset it should be noted that when parties reduce their agreements to writing, the written instrument is presumed to embody their entire contract, and the court should not read into the instrument additional provisions unless this be necessary in order to effectuate the intention of the parties as disclosed by the contract as a whole. An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument. It is not enough to say that an implied covenant is necessary in order to make the contract fair, or that without such a covenant it would be improvident or unwise, or that the contract would operate unjustly. It must arise from the presumed intention of the parties as

gathered from the instrument as a whole."

■ Since the instant case was withdrawn from the jury and the trial court rendered judgment, we must view the evidence in the light most favorable to the losing party, and must indulge against the court's action every inference that may properly be drawn from the evidence. Dunagan v. Bushey, 1953, 152 Tex. 630, 263 S.W.2d 148, and cases cited. In applying the foregoing rule, we have arrived at the conclusion that no covenant to take gas ratably can be implied in the instant case in view of certain provisions of the contract which clearly indicate that the original parties to such contract never intended or contemplated that there would be any ratable taking of gas from appellants' well.

■ The Graham contract is not a lease or grant but a contract for the sale and purchase of gas. Even if the rules applicable to the reasonable exploration and development of oil and gas leases or grants be applied, the express covenants contained in such contract negate the existence of an implied covenant to take more gas or to take gas in a different manner or under different conditions than expressly stipulated in the contract which clearly shows the intention of the parties with respect to the quantity of gas the buyer would be required to take and also the conditions and circumstances under which the buyer could be required to take more gas or in a different manner. It specifically states that Seller shall sell and deliver to Buyer and Buyer shall purchase and receive from Seller a quantity of gas at least equal to one million cubic feet per day multiplied by the number of wells covered by the agreement on the first day of the billing period.

Article VII, Section C, supra, provides that the control, management and operation of the properties shall be and remain the exclusive right of the Seller. Furthermore, the Seller is given the right in its sole uncontrolled discretion to drill new wells, and to repair or rework old wells. The quantity of gas that the Buyer agreed to buy was at least equal to one million cubic feet per day multiplied by the number of wells covered by the agreement. The contract gives appellants the right to drill additional wells and to require the Buyer to take one million cubic feet of gas per day from each additional well. It gives appellants the right to deliver from the common reservoir, if they desired to do so, more than the minimum of one million cubic feet of gas per day by the simple expedient of drilling more wells.

The contract was written to protect both the Seller and the Buyer. For the protection of the Buyer the contract recited that the Buyer had made arrangements for the gas to be purchased by Buyer from Seller to be delivered and sold to Reynolds, and that the Buyer presently had no other market for such gas. It further provided that the quantities of gas to be purchased by Buyer from Seller under the agreement shall not, without Buyer's consent, exceed the quantities of gas actually delivered from time to time under Buyer's said contract with Reynolds Metals Company, less the quantities of gas "heretofore contracted to be purchased by Buyer from time to time from other__ for delivery under said contract with Reynolds Metals Company." Subject to such provision, however, appellants were given the right to drill additional wells, and the right to require Buyer to take one million cubic feet of gas per day from each additional well drilled. Thus they were given the right to produce from the common reservoir and sell to Buyer additional gas if they were not satisfied with the amount of gas that was being taken from their one well.

■ The contract not only provides as to the minimum amount of gas that Buyer was required to take per day from each well of appellants, but further provides that the Buyer shall not be obligated to pay for any gas which was not tendered to the Buyer by Seller. There is no evidence in the record

before us that the Seller ever tendered more gas to Buyer than the amount actually delivered to and paid for by Buyer. The contract further states that the Buyer shall have the right, at its option, to purchase and receive additional quantities of gas up to but not exceeding that quantity each day which the wells then covered by the agreement can lawfully produce, less one million cubic feet per day per well. This provision might well conflict with an obligation on the part of Buyer to take appellants' gas ratably with the gas of others. It also indicates that it was not the intention of the parties that the Buyer could be forced to take and pay for more than one million cubic feet per day from each well, regardless of the amount of gas that appellants' wells could lawfully produce. The contract having expressly provided for the purchase of additional gas at the option of appellees, no covenant may be implied requiring and obligating appellees to purchase gas in excess of the contractual minimum. Danciger Oil & Refining Co. of Texas v. Powell, supra; Cowden v. Broderick & Calvert, Inc., 1938, 131 Tex. 434, 114 S.W.2d 1166.

■ Since the contract in question is not ambiguous and expressly sets out the obligations of both Seller and Buyer with respect to the sale and purchase of gas, the quantities of gas the Seller could require Buyer to take, the conditions under which more or less gas might be delivered or purchased, and other matters related thereto, it will be presumed that the writing contains the whole agreement of the parties, and hence not subject to being varied or contradicted by showing a presumed intention of the parties different from their intention as gathered from the instrument as a whole. Danciger Oil & Refining Co. of Texas v. Powell, supra; Lewis v. East Texas Finance Co., 136 Tex. 149, 146 S.W.2d 977; Natural Gas Dist. Corp. v. Williams, Tex. Civ.App., 355 S.W.2d 194, writ ref., n. r. e.; 23 Tex.Jur.2d, Evidence, Section 342.

The provisions of Article VI, Sec. 1 of the contract which were not invoked by either party thereto provide in substance that not more often than once every five years the Buyer and Seller, at the request of either of them, shall conduct a joint study of the gas reserves of Seller committed to the agreement to determine the quantity of recoverable gas contained therein and to arrive at a new "contract minimum" which can be produced in satisfaction of Seller's delivery obligations under the contract; and that if the contract minimum determined upon the basis of the last joint study be less than one million cubic feet of gas multiplied by the number of wells then covered by the agreement, the Buyer shall be obligated to purchase and receive from Seller while such condition exists, only a quantity of gas equal to the contract minimum multiplied by the number of days in such billing period. It is our view that this provision corroborates the construction placed upon the contract by this Court, and further indicates Buyer's obligations with respect to the purchase of appellants' gas.

■ In Weil v. Ann Lewis Shops, Inc., Tex.Civ.App., 281 S.W.2d 651, writ ref., the court quoted with approval the rules summarized in Cousins Inv. Co. v. Hastings Clothing Co., 45 Cal.App.2d 141, 113 P.2d 878, controlling the exercise of judicial authority to insert implied covenants, as follows:

"(1) The implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract."

Keeping in mind the above rules, we find nothing in the language of the Graham contract to support appellants' contention that there was an implied covenant to take gas ratably or that any such covenant was indispensable to effectuate the intention of the parties or that any such covenant was so clearly in contemplation of the parties that they deemed it unnecessary to express it. The contract in question covers the subject with respect to the production, delivery and taking of gas, and various matters relating thereto, and hence no covenant for ratable taking can be implied. We find nothing in the contract from which an intention of the parties to take ratably can be presumed. There is no reference or suggestion in the contract with reference to proportionate buying, division among various producers, acreage allocation, common reservoir, fair share of gas or any language which could give rise to an implied covenant to purchase ratably. The contract contains clear and unambiguous language with reference to the taking of gas and recalculation provisions with respect thereto. Appellees are given the option to take more gas without reference to the quantity of gas they might take from other parties. Furthermore, the contract expressly gives control of the operation of the property to Seller and the right to drill additional wells and thus to increase the amount of gas that appellees could be required to take. It is our view that the foregoing provisions of the Graham contract negate any intention on the part of the parties thereto to take appellants' gas ratably with gas from the wells of others.

At the time the contract was entered into the field was an unregulated field. The undisputed evidence from appellants' own witness is that only the Railroad Commission of the State of Texas is empowered with the right to establish field rules imposing the ratable taking of gas and it only has the power and authority to prorate productions of gas from other people's property. In the instant case appellants could have asked the Railroad Commission to issue special orders for the Fulton Beach and Lamar South Segment Fields, and thus establish a formula for the ratable taking of gas. This they did not do.

There is in the record some testimony with respect to certain formulas and custom for the ratable taking of gas in unregulated fields. There is, however, no testimony with respect to such alleged custom or business practice covering a contract such as the one in this case which contains specific and definite provisions with reference to the sale and the taking of gas. In any event, since there is no ambiguity in the Graham contract with respect to the production, delivery and taking of gas, and the provisions with reference thereto are express, specific and spelled out in detail and plainly state the rights of the parties, proof of general custom or practice is neither necessary nor proper in the construction of the contract, the intention of the parties derived from the language used where its meaning is clear and unambiguous. Government Personnel Mutual Life Ins. Co. v. Wear, Tex.Civ.App., 247 S.W.2d 284, 288, aff'd & modified on other grounds, 151 Tex. 454, 251 S.W.2d 525. In Miller v. Gray, 136 Tex. 196, 149 S.W.2d 582, 141 A.L.R. 1237, our Supreme Court said:

> "We call attention, however, to the fact that evidence of custom is admissible only to explain an ambiguous contract or to add to it an element not in contravention of its terms; but such evidence is never admissible to contradict the plain unambiguous covenants and agreements expressed in the contract itself."

J. R. Gray Company v. Jacobs, Tex.Civ. App., 362 S.W.2d 167, error ref., n. r. e.; 13 Tex.Jur.2d, p. 305, Sec. 129, Contracts.

In their Points 7 and 8 appellants complain that the court erred in excluding certain exhibits consisting of a summation of calculations as to which their witness, R. C. Haggins, had testified. Appellants have not briefed such points, and

**354**

hence have waived the same. Said witness testified fully, however, with respect to the matters in such exhibits, and hence the exclusion of such exhibits, if it was error, did not result in harm. Furthermore, in view of our holding we find it unnecessary to further discuss such points or the other points contained in appellants' brief, although we have carefully considered them all.

Judgment of the trial court affirmed.