858 P.2d 66

**CONTINENTAL POTASH, INC., et al., Plaintiffs–Appellees and Cross–Appellants,**

v.

**FREEPORT–McMORAN, INC., et al., Defendants–Appellants and Cross–Appellees.**

**No. 19054.**

Supreme Court of New Mexico.

Aug. 10, 1993.

Montgomery & Andrews, John B. Pound, Santa Fe, for appellants and cross-appellees.

Roth, VanAmberg, Gross, Rogers & Ortiz, Michael P. Gross, Raymond Z. Ortiz, Santa Fe, for appellees and cross-appellants.

## OPINION

FROST, Justice.

The motion for rehearing filed in this matter is denied. The decision initially filed in this case is vacated and this opinion is substituted therefore.

Plaintiffs brought this breach of contract and fraud lawsuit in 1982 to recover lost royalty payments, and the jury found for the plaintiffs. Defendants asserted that the plaintiffs' claims were barred by the relevant statutes of limitations and by the doctrines of estoppel and laches. The trial court, however, denied the defendants' motion for summary judgment on these issues.[1] Defendants also moved for a directed verdict at the close of the plaintiffs' case, renewed the motion at the close of all evidence, and moved for judgment notwithstanding the verdict, all of which were denied. In these motions, the defendants primarily claimed that no implied covenants existed, which the jury found the defendants had breached. We conclude that the trial court erred on the statute of limitations issue and in submitting the issue of implied covenants to the jury. Accordingly, we reverse the trial court and vacate the jury's verdict.

---

1. The court granted defendants' motion for summary judgment on the claim concerning its amortization of assets of the Lea County mine and on a RICO claim.

## I. *PROCEDURAL HISTORY*

■ This case arose from agreements made in 1948, 1949, 1951, 1953, and 1956 between the plaintiffs, Continental Potash Company (Continental) and Kansas City Testing Laboratories, Inc. (KCTL), later known as Cross Laboratories, Inc., and the defendants, Freeport Sulphur Company, predecessor to the named defendants Freeport–McMoran, Inc. and Freeport Minerals Company (Freeport), and National Potash Company (National). The agreements granted Freeport the right to explore commercial potash deposits with an option to acquire mining rights through assignment of certain prospecting permits and leases that the plaintiffs held on lands located in southeastern New Mexico. In the assignment of the leases to Freeport, the plaintiffs reserved an overriding royalty interest[2] in the net profits derived from the mining operation.

In a 1982 lawsuit, the plaintiffs alleged that the mining operation conducted by the defendants during the periods 1956–1968 and 1976–1982 should have resulted in substantial net profits instead of accumulating a $16 million net loss. Thus, the plaintiffs alleged that they suffered loss of royalties due to the defendants' breach of contract and fraud in the operation of the mine.

The issues of breach of contract and fraud were tried to a jury, but the parties stipulated that the district court would be the fact finder on all issues concerning the affirmative defenses. The jury returned a verdict in favor of the plaintiffs for breach of implied covenants and fraud. The district court then denied all of the affirmative defenses as a matter of law, finding that the statutes of limitations were tolled by the doctrine of equitable estoppel. The court based its application of the doctrine of equitable estoppel upon its finding that the defendants had fraudulently concealed from the plaintiffs the facts upon which they could have based their lawsuit within the respective limitations periods. The court further concluded that substantial evidence supported each of the jury's express and implicit findings underlying the fraudulent concealment issue.

## II. *ISSUES*

The legal questions presented on appeal are whether the trial court was incorrect (1) to toll the six-year statute of limitations on the contract claims and the four-year statute of limitations on the fraud claim; and (2) to find implied covenants governing the defendants' conduct, which the defendants allege were inconsistent with the express terms of the written agreements. In addition, National challenges the award of compensatory damages ($1,816,690.23) and punitive damages ($3,000,000), and it contends that the court erred by permitting the plaintiffs to recover on the claim of a nonparty, Mary Borders Byrte. National also claims that the trial court should not have submitted the fraud issue to the jury. Because we hold that the district court erred in denying defendants' motion for directed verdict on the statute of limitations issue and in implying and enforcing contractual obligations against the defendants beyond the duties in the written agreements, it is unnecessary to address the other issues raised on appeal and on cross-appeal.

## III. *FACTS*

### A. *The Parties.*

In the 1940s, Walter M. Cross, the original prospector on the lands, discovered a potash deposit in southeastern New Mexico. Cross and members of his family obtained prospecting permits and leases from the federal and state governments for discovering the ore body. Shortly thereafter,

---

**2.** The term "overriding royalty" is used to describe a royalty carved out of a working interest created by an oil, gas, or mining lease. 2 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 418, at 344 (1992). Usually, the reservation of an override involves the transfer of a lease in which the lessee-assignor (in this case the plaintiffs) retains an interest in production in the form of an overriding royalty. The overriding royalty interest is an interest free of the expenses of production. 2 *id.* § 418.1, at 345. It is a nonpossessory interest in land. 2 *id.* § 418.1, at 347.

Cross incorporated Continental for the purpose of developing the ore body and assigned part of his interest in the mineral rights to Continental. Cross also assigned part of his interest in the same mineral rights to KCTL, another closely held corporation.

At about the same time, Freeport was prospecting for potash deposits in the same general area, which led to negotiations between KCTL, Continental, and Freeport about the possibility of Freeport developing both ore bodies. Negotiations resulted in the formation of a contract that was initiated by a letter agreement in 1948 and that was subsequently modified and supplemented in more formal documents in 1949, 1951, 1953, and 1956. In 1948 and 1949, the plaintiffs granted Freeport the right to explore for potash on land in Lea County, New Mexico with the option of receiving assignment of the prospecting permits and mine leases issued by the United States government and the State of New Mexico. In 1951, after initial exploration and completion of the prospecting work, KCTL and Freeport executed another agreement covering two additional mining permits with terms substantially the same as those in the 1949 agreement. Freeport exercised its option for assignment of the permits and leases.

Thus, as of the early 1950s, Freeport was the lessee of the subject mining lands, and the United States and the State of New Mexico were the lessors. KCTL and Continental held overriding royalty interests. KCTL was under the control of Walter Cross until his death in 1954, and Continental had been sold to a group of investors headed by Milton McGreevy.[3] With the consent of the federal and state governments, Freeport assigned its rights as lessee in the potash leases to National in 1955. National was a corporation equally owned by Consolidation Coal Company and Freeport, and it was created for the purpose of developing the Lea County potash deposits.

### B. The Arrangement for Payment of Royalties.

Freeport had agreed to pay KCTL and Continental a royalty of eight percent of the divisible profits from the production and marketing of the mined potash. Sometime after the McGreevy group purchased Continental, a dispute arose between Continental and KCTL concerning their respective royalty rights. The dispute was resolved in 1956 in an agreement between the plaintiffs and National to pool all royalty interests, thus merging fractional holdings into a unified whole. The 1956 agreement expressly superseded previous royalty provisions and granted the plaintiffs a cumulative net profit royalty. Payment of royalties, however, was conditioned upon realizing a net profit during each fiscal year. Under this arrangement, whenever National was in a net profit posture, all royalty holders would receive payment without regard to whose potash was being mined, milled, and sold.

The net profit royalty provisions also included what the parties called a "net loss carry-forward," which meant that if National began production on the mining lands, it was required to pay a net profit royalty in any given fiscal year only if the net loss that had accumulated prior to that year had been overcome. By reserving a net profit royalty instead of a smaller gross receipts royalty, the plaintiffs were tied to the profitability of the mine rather than to its gross output, a fact that became pivotal when the mining operation later proved to be unprofitable.

### C. Exclusive Control and Discretion by National.

In addition to the provisions detailed above, the parties agreed that: (1) National could elect to terminate the agreement or to surrender any permit or lease after giving proper notice to the plaintiffs; (2) National could exercise its sole judgment and discretion in determining which extensions of permits or which leases would be applied

---

**3.** The district court found Cross to be a well-educated, sophisticated businessman and inventor. McGreevy was a sophisticated and knowledgeable businessman as well. He was an original shareholder of Continental.

for; (3) if National failed to instruct the plaintiffs regarding extensions, release to the plaintiffs of any permit or lease would be automatic; (4) National could exercise exclusive control, discretion, and judgment regarding all of its mining operations, and it could determine the quantity of ore mined and the quantity left unmined; and (5) National could elect to suspend operations "for as long as it may determine whenever in its opinion economic conditions or other causes make it desirable so to do." The relevant federal and state statutes, rules, and regulations were incorporated by reference. National also agreed to furnish the royalty holders with periodic financial statements of the results of its operations to be verified by an independent certified public accounting firm and prepared in accordance with generally accepted accounting principles.

### D. *Mining Operations.*

National operated the mine from the time it opened in 1956 until 1968 (first run) when operations were temporarily suspended until 1976. Immediately upon opening the mine, it became apparent that the quality of the Lea County ore was not good enough to render it marketable by itself. To produce a saleable product, National purchased higher grade ore to blend with the lower quality ore.

In 1959 Freeport acquired the right to develop another ore body in Eddy County, New Mexico. The Eddy County mine contained a higher quality ore than the Lea County mine, and National began blending ores from the two mines, which extended the life of both ore deposits. Plaintiffs never owned an interest in the Eddy County mine.

By 1965 most of National's production came from the Eddy County mine. Profits started to decline in 1967, however, and mining operations ceased at the Lea County mine in 1968. Prior to the suspension, National gave the royalty holders notice of discontinuing its mining operations. The plaintiffs never demanded that National surrender or assign the leases to them, and they never claimed that failure to surrender the leases constituted a default under the agreements. With the shutdown of the Lea County mine and production coming solely from the Eddy County mine, the royalty holders did not receive any royalty payments from 1969 to 1973.

When the potash market began to recover in the mid–1970s, National prepared to reopen the Lea County mine. National invested an additional $1.8 million in the Lea County mine and notified the plaintiffs of reopening the mine. The mine had slight production in 1974–75, but not enough to generate a net profit. The mine reopened on a full-scale basis in 1976 and operated until February 1982 (second run). The Eddy County mine was exhausted and closed permanently in 1976. Between 1976 and the closing of the Lea County mine in 1982, National's only potash production came from the Lea County mine. Due to the unprofitable nature of the mining operation, however, the plaintiffs earned no royalties during this period.

Because National had exhausted its Eddy County mine and apparently had no other source of higher grade ore to blend with the ore from the Lea County mine, National decided to "high-grade" the mine during the second run of production. High-grading is a mining term that entails selectively removing the richer grade ore from a mine. The effect is that the remaining mineral deposit is more expensive to retrieve and often impossible to retrieve commercially within a reasonable time period.

### E. *The Agreement Between National and Central Farmers.*

In 1980 and 1981, the price of potash on the export market ballooned and was approximately 30% to 50% higher than National realized from its sales on the domestic market. In their lawsuit, the plaintiffs alleged that National failed to market Lea County potash on the export market in breach of its implied duty to exercise reasonable diligence. Had it done so, they argued, National would have eliminated the accumulated loss carry-forward in two years and generated significant net profits and thus substantial royalties. These lost

royalties were valued in excess of $800,000. National could not take advantage of the boom in the market, however, because it was obligated by an outputs contract.

In December 1958, National entered into a sales agreement with Central Farmers Fertilizer Company (Central Farmers), in which Central Farmers agreed to buy the entire output of the Lea County mine up to 500,000 tons per year through 1974. Central Farmers was interested in developing a continuous source of potash for re-sale to farm cooperatives across the country. National was interested in finding a steady customer for its potash, believing that a guaranteed ongoing customer would give it an advantage against fluctuations in the potash market. In addition, such an arrangement ensured that National could honor its sizable debt service.[4] The price agreed upon was "market price" less a discount to reflect the fact that National could forego employment of a sales staff to market the ore. The parties established as a benchmark for determining market price the "Carlsbad list price."[5] Thus, the price National would receive was tied to prices in the local potash market.

National and Central Farmers simultaneously executed a stock purchase and option agreement, giving Central Farmers an option to purchase enough shares in National to bring its ownership interest up to 45%. The deadline for exercising the options was June 30, 1969.

In January 1964, Central Farmers and National amended their 1958 agreement by changing the price discounting formula and extending the term of the agreement to June 30, 1980. Six months later, Central

Farmers assigned its right to purchase the National stock back to National, released its option to purchase additional shares, and sold the 500 shares it then owned back to National. In July 1964, National and Central Farmers executed another contract in which Central Farmers was given another option to purchase a 45% undivided interest in the mine itself, exercisable for a period of one year after National permanently ceased mining operations. Central Farmers never exercised the option.

### F. Findings by the Jury and the Trial Court.

The jury found that the defendants failed to act as a reasonably prudent operator and thereby breached implied covenants by (1) failing to blend Lea County ore with Eddy County ore during the second run from 1976 until shut-down; (2) high-grading the Lea County ore; (3) failing to sell Lea County ore at the highest and best price obtainable; (4) failing to account with fidelity and charging the plaintiffs' royalty account with improper charges; and (5) failing to surrender the leases when National ceased operations in 1968. The jury also found that the defendants committed fraud but that no additional damages for fraud should be awarded. The jury awarded the plaintiffs compensatory and punitive damages totaling $4,816,690.23,[6] with post-judgment interest at the rate of fifteen percent per year from the date of entry.

In support of its finding of fraudulent concealment, the trial court found that the defendants misrepresented or deliberately did not disclose to the plaintiffs: (1) the true marketing scheme in the Central Farmers contract; (2) the true reason for

---

**4.** Freeport borrowed $12,500,000 from Metropolitan Life Insurance Company and combined with $7,000,000 of its own money, it developed and equipped the Lea County mine. The loan was paid off in 1974.

**5.** The Carlsbad list price was the lowest price quoted and published on a given date by one Carlsbad producer and met by another Carlsbad producer. The Carlsbad list price represented the price at which Carlsbad producers were actually selling their potash at the time. By the late 1960s, the Carlsbad list price no longer represented the actual market price of potash,

despite continued publication of prices by the Carlsbad producers, because of the influx into the market of foreign potash competitors with lower prices.

**6.** The amount of the plaintiff's compensatory damages was derived from calculations based upon the value of ore left in the ground after the high-grading process. The court found that "the remaining product tons in the ground had a then-market value of approximately $380,000,000 and a reasonable royalty value to the plaintiffs on that date in excess of $1,816,690.23."

failing to surrender the Lea County leases when the mine was temporarily closed in 1968; (3) the true risks to the plaintiffs in reopening the Lea County mine in 1976 without the benefit of higher grade ore for blending; (4) the true level of overhead allowable to the plaintiffs' royalty account from 1976 to 1982; and (5) the high-grading program.

## IV.  DISCUSSION

### A.  Introduction.

Defendants contend that the trial court erred when it refused to grant their motion for summary judgment based upon the affirmative defenses of the applicable statutes of limitations and the doctrine of laches.  The defendants claim that the district court misapplied the doctrine of equitable estoppel to toll the statutes of limitations.  The court found that the defendants deliberately failed to disclose material facts to the plaintiffs "on a regular, continuing and complete basis."  The court also concluded that the defendants' silence, misrepresentation, omission, and concealment "constituted fraudulent concealment for purposes of the statute of limitations."  To the contrary, the record shows that the plaintiffs expressed detailed concern about their contractual rights, the prospects for payment of royalties, the marketing plan under the Central Farmers contract, and accounting procedures as they pertained to their royalty account.  In addition, the defendants had no fiduciary relationship with the plaintiffs and thus no duty to disclose information to them, the breach of which might have constituted fraudulent concealment.  They could have filed suit within the relevant time periods.

Regarding the breach of implied covenants, the plaintiffs argue that implied covenants are the bedrock of mining law and are designed for the protection and mutual benefit of both parties.  The defendants claim that implied covenants may be found only when they embody the intention of the parties and are necessary to give effect to that intention.  In any event, the defendants claim that implied covenants may not exist when express contractual provisions address the same subject matter.  We hold that the trial court erred as a matter of law when it enforced implied covenants against the defendants on the issues not barred by the statutes of limitations.

### B.  Standard of Review.

■  We review the district court's application of equitable estoppel under an abuse of discretion standard.  See Padilla v. Lawrence, 101 N.M. 556, 562, 685 P.2d 964, 970 (Ct.App.), cert. denied, 101 N.M. 419, 683 P.2d 1341 (1984) (decision whether equitable relief should be granted is within the sound discretion of trial court and will not be reversed on appeal unless clear abuse is shown).  "An abuse of discretion will be found when the trial court's decision is clearly untenable or contrary to logic and reason." Newsome v. Farer, 103 N.M. 415, 420, 708 P.2d 327, 332 (1985).  Such discretion is not a mental discretion to be exercised as one pleases, but is a legal discretion to be exercised in conformity with the law. Sunwest Bank of Albuquerque v. Roderiguez, 108 N.M. 211, 213, 770 P.2d 533, 535 (1989).

■  We review the district court's finding of implied covenants according to whether it correctly applied the law to the facts in the case. Farmers, Inc. v. Dal Machine & Fabricating, Inc., 111 N.M. 6, 8, 800 P.2d 1063, 1065 (1990).  In addition, we view the district court's findings of fact most favorably for the appellee, indulging all reasonable inferences in its favor, but the conclusions of law must be based upon and supported by the findings of fact. Id.

### C.  Tolling the Statutes of Limitations—Equitable Estoppel.

■  Estoppel precludes one party from asserting a right when another party has relied to his detriment upon the acts or conduct of the first party and when asserting that right would prejudice the other who has acted thereon in reliance. Garcia v. Garcia (In re Estates of Salas), 105 N.M. 472, 475, 734 P.2d 250, 253 (Ct.App. 1987).  As we stated in Capo v. Century

*Life Insurance Co.,* 94 N.M. 373, 610 P.2d 1202 (1980):

> The essential elements of equitable estoppel as related to the party estopped ... are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention that such conduct shall be acted upon by the other party ...; and (3) knowledge, actual or constructive, of the real facts.... As related to [the party claiming] estoppel, the essentials are: (1) lack of knowledge and of means of knowledge of the truth as to the facts in question ...; (2) reliance upon the conduct of the party estopped ...; and (3) action based thereon of such character as to change its position prejudicially.

*Id.* at 377, 610 P.2d at 1206; *Stuckey's Stores, Inc. v. O'Cheskey,* 93 N.M. 312, 324, 600 P.2d 258, 270 (1979), *appeal dismissed,* 446 U.S. 930, 100 S.Ct. 2145, 64 L.Ed.2d 783 (1980).

We find particularly significant here the requirements of lack of knowledge and the lack of means by which knowledge might be obtained by the party asserting estoppel. *See Garcia,* 105 N.M. at 475, 734 P.2d at 253. In addition, the party asserting estoppel must show that he relied upon conduct, and such reliance must have been reasonable. *C & L Lumber & Supply, Inc. v. Texas Am. Bank/Galeria,* 110 N.M. 291, 297–98, 795 P.2d 502, 508–09 (1990). Equitable estoppel will be applied when the party estopped intends or expects that the innocent party will act on those representations. *Green v. New Mexico Human Servs. Dep't, Income Support Div.,* 107 N.M. 628, 629–30, 762 P.2d 915, 916–17 (Ct.App.1988). So, a party may not claim estoppel unless there is reasonable reliance upon the acts or conduct of another, and he is induced to take or forgoes from taking a position to his prejudice or detriment. *Capo,* 94 N.M. at 377, 610 P.2d at 1206.

The existence of grounds justifying a claim of equitable estoppel is a question of fact, and the party alleging and relying on such claim has the burden of establishing all facts necessary to prove it. *Garcia,* 105 N.M. at 475, 734 P.2d at 253. In the case of fraudulent concealment, the facts that a party must show are: (1) the use of fraudulent means by the party who raises the bar of the statute; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of reasonable diligence could not have known that he might have a cause of action. *See Keithley v. St. Joseph's Hosp.,* 102 N.M. 565, 570, 698 P.2d 435, 440 (Ct.App.1984), *cert. quashed,* 102 N.M. 565, 698 P.2d 435 (1985).

The party must plead the circumstances giving rise to estoppel with particularity. *Hardin v. Farris,* 87 N.M. 143, 146, 530 P.2d 407, 410 (Ct.App.1974). Bald allegations of concealment are not sufficient to make out a case of fraudulent concealment. *See* SCRA 1986, 1–009(B) (Repl.Pamp.1992). So, the party asserting estoppel must sustain the burden of showing not only that he failed to discover the cause of action prior to the running of the statute of limitations, but also that he exercised due diligence and that some affirmative act of fraudulent concealment frustrated discovery notwithstanding such diligence. *See Capo,* 94 N.M. at 377, 610 P.2d at 1206; *Keithley,* 102 N.M. at 570, 698 P.2d at 440.

### D. *The Breach of Contract Claim.*

After thorough and careful review of the record, proceedings, and exhibits, we are compelled to hold that the district court abused its discretion in applying the doctrine of equitable estoppel to toll the six-year statute of limitations on the breach of contract claim. The grounds upon which the plaintiffs based their claims were apparent to them many years prior to filing the 1982 complaint, and they could have commenced the action within the statutory

period.[7] The contents of the correspondence generated between the defendants and the plaintiffs throughout the relevant time period reveal the circumstances and details surrounding each fact identified by the trial court as a material fact allegedly concealed from the plaintiffs.

The plaintiffs' allegations pertaining to fraudulent concealment on the breach of contract and fraud claims overlap to some extent. For the most part, however, the plaintiffs point to circumstances surrounding the Central Farmers agreement and the defendants' failure to surrender the leases in 1968 as supporting the trial court's application of equitable estoppel to toll the statute of limitations on the breach of contract claim. Regarding the allegation of fraud, the plaintiffs claim that the defendants' misrepresentations about the prospects for future profits, especially at the beginning of the second run, support the trial court's application of equitable estoppel to toll the statute of limitations on the fraud claim.

### 1. *The Central Farmers Agreement.*

Plaintiffs theorize that the sales agreement between National and Central Farmers was unreasonably beneficial to Central Farmers and unduly burdensome to National. They contend that the favorable terms for Central Farmers were the result of a less than arms-length relation between the two corporations. The argument is that if National had sold its product on the open market during the period in which it was obligated by the Central Farmers contracts, it would have shown a profit and would have been able to pay royalties to the plaintiffs. The plaintiffs were aware of these facts, however, many years before 1976, which was the inception of the six-year period on the contract claim provided by the statute of limitations.

The record indicates that National made no effort to conceal from the plaintiffs its 1958 contract with Central Farmers. In fact, two weeks after the sales agreement was executed, Continental learned about it. McGreevy expressed his opinion that the

sales agreement was not in the normal course of business and might adversely affect National's profits, which in turn could prejudice the royalty holders' interests. The royalty holders complained about the royalty arrangement and sought to amend the contract. In the same month, Wells, an agent of National, answered McGreevy and refused to amend the agreement, stating that the "royalty holders are in the position of sharing not only the profits from mining but also the risk ... [and that] mining on these leases has resulted in very substantial losses to this company since February 1957, when ore was first mined on them ... [which] have been a direct result of the vastly inferior quality of the ore found on these leases compared to other ore presently being mined on a commercial basis in the Carlsbad area."

In a letter dated April 4, 1960, McGreevy complained to his lawyer about the Central Farmers contract:

> In addition it seems to me it is a major item in this situation that [Freeport] sold half their stock in National Potash to a cooperative which means their profits will not be handled on a normal corporation basis and since our royalties are related to the profit, they may have by that action prejudiced our future position.
>
> \*    \*    \*    \*    \*    \*
>
> *I am wondering if we could go into court* and reconstrue [sic] the whole situation in such a way as to protect our equitable position in that we might be entitled to a fair royalty on a basis of tonnage mined. If we don't do something like that, I am very doubtful as to whether our stockholders will have any kind of a proper recovery for their investment and for their position in this matter. [Emphasis added.]

In November 1960, McGreevy again complained to Wells specifically about the contract with Central Farmers. McGreevy wrote another letter to Wells in January

---

**7.** Generally, actions based on written contracts must be brought within six years of an alleged

breach. *See* NMSA 1978, § 37–1–3(A) (Repl.Pamp.1990).

1962 complaining about the same thing. In the January 1962 letter, the plaintiffs again expressed detailed concerns about the Central Farmers arrangement, the discretion to operate the mine that was granted to the defendants under the agreements, and the alleged accounting inequities. The letter states in part:

> [W]e made some legal investigation ... and we have not gone to great expense to employ accountants to exhaustively study this situation or attorneys to explore it fully, but we did develop some rather strong and persuasive decisions of law ... that the operator must conduct his operations in such a way as to be fully fair and equitable to the royalty owner....
>
>     *     *     *   -   *     *     *
>
> We think that your operations have been without proper regard to our position ... and that we have enforceable rights to correct this situation.... [W]e feel very strongly that under the fiduciary relationship that exists between National Potash and [the royalty interest holders], the former has not only failed to protect the interests of the latter but has subordinated them to what has most suited your company with resultant prejudice to the [royalty interest holders]. This certainly could never have been the purpose of our agreement.

Wells answered in March 1962 and vigorously defended National, advising McGreevy in no uncertain terms that National was not going to renegotiate the contracts or pay a "settlement" to the royalty holders.

By letter of March 1962, the defendants responded in detail to each ground that the plaintiffs addressed, in particular the history of the Lea County mine, the lack of profits, and the reasons for the long-term contract with Central Farmers. Moreover, in a 1963 letter to the plaintiffs, their attorney "summarize[d] the exchange of correspondence and arguments with National Potash Company" and suggested a response. In 1963, one of the royalty interest holders, in summarizing his conversation with one of the defendants' agents, stated:

> the question of a law suit has in fact been mentioned from time to time in discussion among the [royalty interest holders], but none of them would be desirous of taking such course of action if it could be avoided.
>
> Even if legal action was taken, the sentiment would not be one of ill will or anger but rather as a result of a feeling of frustration. It would be the same as if having exhausted all possible avenues of reaching a friendly settlement, there was nothing left but to test the validity of the contract through the Courts. In this connection, the [royalty interest holders] might feel that there was nothing to lose by trying this.

Despite all of this, the plaintiffs waited until 1982 to file a lawsuit alleging breach of contract. Clearly, at least by 1962, plaintiffs were aware of the Central Farmers marketing plan and possessed sufficient knowledge upon which to base a breach of contract action against the defendants.

McGreevy's letters quoted above also indicate an awareness of a possible conflict of interest arising from the agreement between National and Central Farmers. McGreevy specifically addressed the conflicts of interest in a subsequent letter to Wells. The plaintiffs were also aware that National was according multiple discounts to Central Farmers over and above the discount specified in the outputs contract. In addition, the plaintiffs complained that the price structure in the Central Farmers agreement decreased and that they had no way, absent disclosure from National, to discover the true price at which National sold potash to Central Farmers. The plaintiffs stated that no one outside the potash industry could learn the price of potash. Yet, McGreevy sat on the board of directors of a company that was also in the potash market. Thus, if the plaintiffs were not aware of material facts, McGreevy and the others could have discovered the material facts through exercise of due diligence.

## 2. *The Failure to Surrender the Leases.*

Any breach of contract or implied covenant for failure to surrender the leases occurred in 1968 at the end of the first run. National contemporaneously notified the plaintiffs of the shut-down, but they failed to demand surrender of the leases. Being aware of the shut-down, the plaintiffs had the option of immediately demanding surrender or filing suit based upon this factor within six years after the 1968 shut-down.

The plaintiffs claim that the true facts surrounding the nonsurrender were not communicated to them, but in fact, they were informed of the mounting losses after 1968. The gravamen of the plaintiffs' lawsuit was to recover royalties that should have resulted from a profitable mining operation. Yet the plaintiffs were aware of the escalating debt from the financial reports from 1968 to 1976, and still they waited until 1982 to file their lawsuit premised upon lost profits due to the nonsurrender of the leases in 1968. This is a classic example of "sitting on one's rights."

## 3. *The Absence of Fraudulent Concealment.*

As stated above, the plaintiffs were aware of certain material facts upon which to base their breach of contract claim in the early 1960s. Their argument that the defendants misrepresented those facts to them, therefore, fails to support the application of equitable estoppel. In addition to claiming that the defendants affirmatively misrepresented facts to them, the plaintiffs claim that the defendants failed to disclose certain other material facts, which also constituted fraudulent concealment.

To invoke the doctrine of equitable estoppel by silence, the party must first establish that there was a duty to speak, and he must show that the silent party knew that he was relying upon that silence. *Capo,* 94 N.M. at 377, 610 P.2d at 1206. If there is a confidential or fiduciary relationship between the parties, the failure to disclose material facts or the suppression of material facts when required to disclose them, which induces detrimental reliance, may constitute fraudulent concealment giving rise to equitable estoppel. *Keithley,* 102 N.M. at 570, 698 P.2d at 440. Absent a fiduciary duty to speak on the part of the defendants, however, silence, nondisclosure, or denials of alleged fraudulent conduct are insufficient to constitute fraudulent concealment so as to toll a statute of limitations. *Capo,* 94 N.M. at 377, 610 P.2d at 1206.

The plaintiffs confuse the issue here by claiming that an implied covenant of good faith, which the trial court found existed, imposed a duty upon National to disclose material information. National's systematic failure to disclose material information in breach of its implied covenant of good faith, the plaintiffs argue, constitutes fraudulent concealment, thereby tolling the statutes of limitations. The issue of implied covenants in this case, however, goes to whether a breach of contract existed, not to whether National had a duty to disclose material information, the breach of which might have constituted fraudulent concealment. Unlike fiduciary duties, covenants of good faith do not require an exclusive operator to subordinate its interest to that of the royalty holders. *Murdock v. Pure–Lively Energy 1981–A, Ltd.,* 108 N.M. 575, 579, 775 P.2d 1292, 1296 (1989). Even though the defendants owed contractual duties to the plaintiffs and also owed them a duty of good faith and fair dealing, a fiduciary relationship did not automatically arise from these circumstances in which the defendants were essentially handling their own property. *See Garfield v. True Oil Co.,* 667 F.2d 942, 945 (10th Cir.1982). Given the type of agreement at issue here and the legal relationship between the parties, albeit heavily tilted in favor of National, no fiduciary duty existed, and the trial court so found. Without a fiduciary duty, no duty to disclose or speak existed. Thus, silence or failure to disclose certain information to the plaintiffs here could not operate to toll the statutes of limitations.

Notwithstanding our holding that no duty to disclose existed, the record does not demonstrate that throughout the relationship between the parties from 1948 to 1982,

the defendants intentionally and deliberately concealed facts with the hope that the plaintiffs would forego bringing legal action. As has been demonstrated, the plaintiffs contemplated legal action in the 1960s predicated upon the Central Farmers agreement, and any issues presented in their 1982 lawsuit based upon nonsurrender were apparent to them in 1968 when National shut the Lea County mine down, but in any event before 1976. Defendants' conduct and representations, therefore, cannot be characterized as concealing facts material to a determination by the plaintiffs about whether to file suit. The trial court, therefore, erred in applying the doctrine of equitable estoppel in light of the terms of the contract, the duties and obligations attendant thereto, and the knowledge demonstrated by the plaintiffs in the 1960s.

### E. The Fraud Claim.

■ The defendants assert that the plaintiffs failed to allege fraud at trial and that their only claim below was for breach of implied covenants. The defendants claim that the trial court confused the issue when it submitted the issue of substantive fraud to the jury when the only issue before the court was whether the defendants were guilty of fraudulent concealment to support the application of equitable estoppel to toll the statute of limitations on the contract claims. Distinguishing fraud from fraudulent concealment, the defendants claim that fraud should not have been an issue in the case at all. The jury found that the defendants committed fraud, however, and the trial court sustained its finding. Accordingly, we will review that decision.

The plaintiffs allege that the defendants committed fraud in operating the Lea County mine and base that claim primarily upon the defendants' representations of the prospects for royalties during the second run of production. As discussed above, however, the plaintiffs demonstrated sufficient knowledge of these issues more than

four years before the complaint was filed in 1982.[8] Consequently, they were time-barred from pursuing a fraud claim on these grounds as well.

### 1. Representations about Future Profits.

The record contains additional statements by Wells, in a November 1956 letter, that can be properly characterized as expressions of opinion and speculation about the mining operation and its relationship to royalties for the plaintiffs. On November 15, 1960, McGreevy expressed in a letter his concerns about the accounting techniques, the relationship between National and Central Farmers, and the lack of profits in 1960. This letter demonstrates an awareness of additional grounds upon which the plaintiffs based their fraud claim.

Again in 1963, at a royalty holders' meeting, it was acknowledged that another deficit from the Lea County mine was possible, but that "no immediate action should be taken on a lawsuit at this time" presumably based upon the plaintiffs' hope that royalties would begin to flow in 1964. Another of the defendants' letters, dated February 1966, candidly expressed the facts that production at the Lea County mine was low, that "[f]urther expansion does not seem likely," and that the level of mineralization from the Lea County mine was "unusually low." A discussion of accounting procedures relating to the Lea County mine was also included in the letter to McGreevy. In 1967, the plaintiffs were aware that it "was doubtful that there would be any profit to [the royalty interest holders] for the next two years and perhaps even a slight loss." In that letter, the issue of the defendants' discretion to operate the mine was raised again. After approximately $78,000 was paid in royalties during the mid–1960s, National went into a net loss position that steadily grew during the late 1960s and early 1970s. Most significantly, the plaintiffs had knowledge of the accumulating losses from the annual

---

**8.** Fraud actions must be brought within four years of the event, NMSA 1978, Section 37–1–4 (Repl.Pamp.1990), or from the time the fraud is discovered, Section 37–1–7.

financial statements that they received from National.

The plaintiffs were notified that the July 1968 shutdown of the Lea County mine was "a result of market condition." In 1968, when National closed the mine, the plaintiffs obviously were aware of the impossibility of realizing a profit from a closed mine. In January 1973, Rothwell, an official of National, wrote McGreevy predicting bad times for the American potash industry due to intense price competition from Canada, and reminded him that National may never reopen the mine. Rothwell's letter of January 29, 1973, tells McGreevy that the Canadian potash producers were expected to bring down the price of potash to a point where National would not be able to compete. Rothwell said nothing that any reasonable person could read as guaranteeing future net profits, thus lulling the plaintiffs into repose. He certainly said nothing that would give a reasonable person the impression that any future net profit would be large enough or consistent enough to wipe out the then existing accumulated loss. In an August 1974 letter to McGreevy, Wells worded his comments on reopening the mine in conditional terms and stated that the mine might not reopen. The letter cannot be read as giving a guarantee of sustained, significant profit. Rather, it was more akin to an opinion than to fact, which the plaintiffs confirm by continually referring to the alleged actionable statements by the defendants as "puffing." Fraud cannot be predicated upon the expression of an opinion. *See Agnew v. Landers,* 59 N.M. 54, 66, 278 P.2d 970, 977 (1954).

### 2. *The plaintiffs' fraud claim was time-barred.*

Any allegation of fraud should have been filed in the late 1960s or early 1970s when the correspondence between the parties demonstrates the plaintiffs' awareness of facts upon which they eventually based their fraud claim, specifically the absence of profits. The 1956 agreement contained no guarantee of a net profit, but it did openly contemplate the possibility of net losses and the accumulation of a growing net loss. It specifically addressed a net loss carry-over arrangement, which clearly meant that no royalty would be paid until the entire accumulation was eliminated, and the plaintiffs indicated that they understood this arrangement. By 1976, with the mine open again and functioning on a full-scale basis, the net loss had grown substantially. The plaintiffs were aware or should have been aware of this from the financial records they received from National from 1975 to 1977. Any cause of action for fraud based upon the facts articulated by the plaintiffs, therefore, clearly arose before 1978, more than four years prior to filing the complaint.

### F. *The Breach of Implied Covenants— Blending and High–Grading.*

Our conclusion that the statutes of limitations barred the plaintiffs' contract and fraud claims cannot logically reach two issues: the failure to blend and high-grading during the second run of production. Because the second run did not begin until 1976, the plaintiffs' contractual claims concerning blending and high-grading necessarily fall within the six-year limitations period. In addition, the plaintiffs claim that they did not discover that National had performed high-grading until after they filed their complaint in 1982.

The jury found and the trial court held that the defendants failed to act as a reasonably prudent operator when they failed to blend ore during the second run of production beginning in 1976. The court also held that the defendants acted in bad faith and failed to act as a reasonably prudent operator when they began high-grading ore in 1978. On appeal, the plaintiffs claim that the trial court correctly implied a duty of reasonable diligence and care upon the defendants, which the defendants breached when they failed to blend and failed to refrain from high-grading. The defendants claim that the express agreements between the parties supersede and foreclose the existence of any implied covenants.

### 1. *Construction of Contracts.*

■ In interpreting mining agreements, courts generally have applied the rules for interpreting contracts and leases. 4 *American Law of Mining* § 130.04, at 130–9 (2d ed. 1992). That is, courts will give effect to the intent of the parties, and when the terms of the agreement are clear and unambiguous, courts try to ascertain the intent of the parties from the ordinary meaning of the language in the agreement. *Id.* This has long been the rule in New Mexico: "The primary objective in construing a contract is to ascertain the intention of the parties." *Mobile Investors v. Spratte,* 93 N.M. 752, 753, 605 P.2d 1151, 1152 (1980). "The purpose, meaning and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive. The court's duty is confined to interpretation of the contract which the parties made for themselves and may not alter or make a new agreement for the parties." *Davies v. Boyd,* 73 N.M. 85, 87–88, 385 P.2d 950, 951 (1963).

■ We are impressed with a Texas court's analysis of whether an implied covenant exists in the context of mining law, and we adopt it. The Texas Court of Civil Appeals has stated:

In the outset it should be noted that when parties reduce their agreements to writing, the written instrument is presumed to embody their entire contract, and the court should not read into the instrument additional provisions unless this be necessary in order to effectuate the intention of the parties as disclosed by the contract as a whole. An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument. It is not enough to say that an implied covenant is necessary in order to make the contract fair, or that without such a covenant it would be improvident or unwise, or that the contract would operate unjustly. It must arise from the presumed intention of the parties as gathered from the instrument as a whole.

*Kingsley v. Western Natural Gas Co.,* 393 S.W.2d 345, 350–51 (Tex.Civ.App.1965) (quoting *Danciger Oil & Refining Co. of Tex. v. Powell,* 137 Tex. 484, 154 S.W.2d 632 (1941)).

### 2. *Implied Covenants.*

■ Thus, implied covenants are not favored in law, especially when a written agreement between the parties is apparently complete. *Stern v. Dunlap Co.,* 228 F.2d 939, 942 (10th Cir.1955). The general rule is that an implied covenant cannot co-exist with express covenants that specifically cover the same subject matter. *Kingsley,* 393 S.W.2d at 350.

■ When it is clear, however, from the relevant parts of the contract taken together and considered with the facts and circumstances surrounding the execution of the agreement, that the obligation in question was within the contemplation of the parties or was necessary to effect their intention, then such obligation may be implied and enforced. *Stern,* 228 F.2d at 942–43. But when the contract between the parties speaks to the obligation sought to be implied, courts will not write that implied obligation into the contract. *Kerr–McGee Corp. v. Bokum Corp.,* 453 F.2d 1067, 1073 (10th Cir.1972). Stated conversely, there may be "an implied covenant on the part of the lessee (*in the absence of any expressed on the subject as in this lease*)...." *State ex rel. Shell Petroleum Corp. v. Worden,* 44 N.M. 400, 404, 103 P.2d 124, 126 (1940) (emphasis added).

### 3. *The provision granting defendants exclusive control.*

■ We believe that the express provisions in the contract according the defen-

dants exclusive discretion and control in the mining operations left no room for the implied covenants that the trial court enforced against the defendants. The situation here is very similar to that discussed in an often-cited treatise.

Instead of imposing duties upon the operator for the benefit of the owner of a nonoperating interest, the instrument creating the interest may contain a clause relieving the operator from certain obligations which might otherwise be alleged to exist. Such clauses take a variety of forms; typical is the following:

"Development of, and operations on the premises, if any, and the extent and character thereof, as well as the preservation or forfeiture of the leasehold, shall be solely at the will of said (assignee) or its successors or assigns. . . ."

2 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* § 429, at 489–90 (1992). Here, the contract specified that "the nature and extent of all work done by Freeport on the Mining Lands and the time and manner of doing the same shall rest in the sole judgment and discretion of Freeport." The contract also stated that "the nature and extent of all exploration, development and mining operations and the time and manner of performing the same shall be as Freeport in its sole judgment and discretion shall determine and Freeport shall have the right at all times to determine the quantity of ore to be mined and what ore is to be left unmined. . . ." In addition, the contract provided that National "may at any time and from time to time suspend mining operations or other operations for as long as it may determine whenever in its opinion economic conditions or other causes make it desirable so to do."

These express provisions supersede any implied obligation regarding operation of the mine and preclude the implication of any implied covenants advocated by the plaintiffs and enforced by the trial court. The implied covenants were not necessary to give effect to the intentions of the parties as reflected in the language of the contract. On the contrary, the implied cov-

enants were inconsistent with the intentions of the parties as expressed in the written agreements. Given the specific language in the written agreements between the parties, it was error for the trial court to imply obligations that were inconsistent with the unambiguous language expressing the intention of the parties to extend the defendants absolute control over mining operations.

### 4. *The Lessor–Lessee Cases.*

██ Were it not for the express contractual provisions governing the relationship between the plaintiffs and the defendants and superseding any implied covenants, the plaintiffs' argument would still fail. Much of the precedent that the plaintiffs cite in support of the implied covenants pertains to the relationship and the concomitant duties between a lessor and a lessee, not between the holder of an overriding royalty interest and a working interest (lessee), which was the relationship between the parties here. The trial court found that there was "no lessor-lessee relationship at any time" between the parties. Again, we find guidance from Williams & Meyers:

The owner of an overriding royalty is not entitled to the benefit of the covenants of the base lease, express or implied, in the absence of an express provision in the instrument creating the overriding royalty. The benefits of such express and implied covenants of the lease touch and concern the lessor's estate and the burdens of such covenants touch and concern the lessee's estate. The assignment, either in whole or in part of the burdened estate, will not permit enforcement of the covenants which burden the assigned estate by a person other than the lessor or claimants through him of a portion or all of the benefitted estate.

2 *id.* § 420, at 356–57. Because the plaintiffs' cases pertain to the legal relationship between a lessor and lessee and not the rights of a lessee and a holder of an overriding royalty, the plaintiffs' cases are not persuasive.

There are occasions, however, when courts will imply covenants to protect the interests of an owner of an overriding royalty that is carved out of a working interest such as the case here. 2 *id.* § 420.1, at 356.1. The only instance in which courts seem to be in universal agreement is in implying a covenant against drainage in an oil and gas lease. *See, e.g., Cook v. El Paso Natural Gas Co.,* 560 F.2d 978 (10th Cir.1977).

The plaintiffs rely heavily upon *Cook,* but we find the analogy from the covenant against drainage in an oil and gas lease to the mineral lease here untenable. The plaintiffs cite *Cook* for two propositions: that a lessee-operator has an implied duty to act in compliance with the reasonably prudent operator standard for the benefit of the nonoperator royalty holder; and that an express covenant does not necessarily negate the existence of an implied covenant. In *Cook,* however, the Tenth Circuit Court of Appeals held that an implied covenant obligating the lessee to act as a reasonably prudent operator did not apply. *Id.* at 984. Rather, the court held that an implied covenant existed obligating the operator to refrain from depleting gas on the owner's property by drainage from the operator's adjacent leasehold. Courts generally will uphold an implied covenant to protect against drainage because drainage is tantamount to conversion. *See id.* at 983. In addition, the *Cook* court did not go so far as to state categorically that an express covenant is always subject to implied obligations; rather, the court simply construed the express provision at issue in that case as ambiguous and found that it did not supersede an implied covenant against drainage. *Id.* at 986.

The plaintiffs also rely upon *Darr v. Eldridge,* 66 N.M. 260, 346 P.2d 1041 (1959), as upholding the trial court's finding of an implied covenant to exercise reasonable diligence. In *Darr,* this Court stated that "courts have developed the implied covenant 'to make diligent efforts to market the production in order that the lessor may realize on his royalty interest.'" *Id.* at 263, 346 P.2d at 1044 (citing *Libby v. De*

*Baca,* 51 N.M. 95, 99, 179 P.2d 263, 265 (1947)). The plaintiffs' reliance again is misplaced; this is another lessor-lessee case. Nevertheless, the holding in *Darr* might support the plaintiffs' claim on the surrender breach (failing to market potash when National terminated production in 1968), but we have held that the six-year statute of limitations barred plaintiffs' claim on that issue. The plaintiffs were notified of the shut-down in 1968, and they could have brought an action supported by *Darr* and *Libby,* if any, then or six years thereafter, but that claim was time-barred by the time they filed their complaint in 1982.

### 5. *The Implied Covenant of Good Faith and Fair Dealing.*

■ In the absence of any covenants implied into the agreement between the parties, the owner of an overriding royalty interest is not without protection. Whether express or not, every contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract. *Watson Truck & Supply Co. v. Males,* 111 N.M. 57, 60, 801 P.2d 639, 642 (1990). The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party. *Id.* The trial court found that the defendants acted in wanton disregard of the plaintiffs' interests by high-grading the ore in the Lea County mine. We cannot agree with the trial court that the defendants acted in bad faith by high-grading when the contract expressly gave them exclusive discretion in mining operations.

■ The covenant of good faith and fair dealing does not impose affirmative duties upon one party to protect another; instead, it proscribes action that in this case would have resulted in avoiding royalty payments. *See Tidelands Royalty "B" Corp. v. Gulf Oil Corp.,* 804 F.2d 1344, 1354 (5th Cir.1986). To show bad faith in this case, for example, the plaintiffs would have had to prove that the defendants would not have conducted a high-grading

program in the absence of the overriding royalty interest, that by high-grading the defendants somehow sought to avoid making royalty payments.

Merely asserting that National failed to take action that might have been beneficial to the royalty holders does not show bad faith. Instead, the plaintiffs would have to prove that *but for* the pecuniary advantage of avoiding the royalty payments, the defendants would not have performed high-grading at the Lea County mine. *See id.* Adopting the plaintiffs' position (implying a duty to refrain from high-grading) would be the same as imposing a fiduciary duty upon the defendants, which we already have stated did not exist. The defendants were not obligated to act to their economic detriment for the benefit of the plaintiffs. *See Murdock v. Pure–Lively Energy 1981–A, Ltd.*, 108 N.M. 575, 579, 775 P.2d 1292, 1296 (1989) (covenants of good faith, unlike fiduciary duties, do not require exclusive operator to subordinate its interest to that of royalty holders). In fact, it could be said that high-grading was in furtherance of the royalty holders' interests. The aim of high-grading as the plaintiffs admitted is profits, albeit short-term profits. As long as the defendants were seeking profits, that was beneficial for the royalty holders and in furtherance of their interests. Any resulting inconvenience in the retrieval of the remaining ore might constitute waste, but that would be actionable only by the lessor, not the holders of an overriding royalty interest.

### 6. *No Implied Covenants Existed.*

It was beyond question that the parties left the mining operation within the sole discretion of the defendants. National could exercise exclusive control, discretion, and judgment regarding all its operations and performance, and it could determine the quantity of ore mined and the quantity left unmined. In addition, National could elect to suspend operations "for as long as it may determine whenever in its opinion economic conditions or other causes make it desirable so to do." Implied covenants generally exist only in a lessor-lessee rela-tionship, and covenants will not be implied when express contractual provisions govern, with the one exception of a covenant against drainage. Thus, the trial court erred as a matter of law in finding and enforcing implied covenants against the defendants that were inconsistent with the provisions of the written agreements. The trial court also erred when it held that the defendants' high-grading constituted bad faith when the contract allowed the defendants to conduct mining operations at their discretion. It would be incongruous to hold that the defendants acted in bad faith in acting in accordance with an express contractual provision.

## V. CONCLUSION

As we have pored through the record in our consideration of the statute of limitations issue, we have tried to distinguish between what the plaintiffs knew or should have known and what the defendants did. We sympathize with the plaintiffs about the unfortunate events surrounding their agreement with the defendants, but the law requires a proper application of the doctrine of equitable estoppel for purposes of tolling statutes of limitations. Plaintiffs hoped, as did National, that the potash market would be favorable and that the Lea County mine would be highly profitable. While we might speculate now about what the defendants should or should not have done relative to their contractual duties, any breach of those duties was apparent to the plaintiffs long before 1976.

Although the circumstances turned out otherwise, as a matter of law the plaintiffs cannot second-guess business decisions made years ago in an attempt to recover damages unless they could prove that National concealed material facts and circumstances from them. The correspondence between the parties, however, shows a clear understanding on the part of both parties that they were dealing with an unpredictable market. The correspondence also demonstrates that the plaintiffs were aware of the defendants' alleged breaches, but failed to assert their legal rights until it was too late. The record indicates that

the plaintiffs were or should have been aware of sufficient information upon which to allege a breach of contract claim as early as the 1960s.

Thus, the plaintiffs' claim of fraudulent concealment based upon alleged affirmative misrepresentations by the defendants fails because they were aware of those facts. Concerning the facts that the plaintiffs claim were not disclosed to them by the defendants, the defendants had no affirmative duty to disclose to the plaintiffs. Thus, there was no fraudulent concealment arising from the breach of a fiduciary duty either.

Pertaining to the blending and high-grading issues, the contracts between the parties were specific and unambiguous, leaving no room for the existence of implied covenants dealing with the same duties and obligations. The implied covenants imposed by the trial court were inconsistent with the express contractual provisions. National had the right to exercise exclusive control, discretion, and judgment regarding all mining operations, thus defeating the plaintiffs' claim as to blending. In addition, the defendants could determine the quantity of ore mined and the quantity left unmined, thus foreclosing the plaintiffs' argument regarding high-grading. It is not the function of the courts in this state to rewrite a contract by implying covenants between parties when an express written agreement exists. "There are some things the court cannot do and one is to do for the parties what they failed to do for themselves." *Kimberly, Inc. v. Hays*, 88 N.M. 140, 145, 537 P.2d 1402, 1407 (1975). Thus, the trial court incorrectly applied the law to the facts in this case by implying covenants against the defendants.

In sum, the trial court erred in holding that the breach of contract claims and the fraud claim were not barred by the applicable statutes of limitations. The trial court abused its discretion in tolling the statutes of limitations. The record does not support the trial court's finding of fraudulent concealment nor the application of equitable estoppel to preclude the defendants from asserting the statute of limitations defenses. The trial court also erred as a matter of law in finding and enforcing implied covenants against the defendants. Accordingly, we vacate the jury's verdict and reverse the trial court's judgment that ratified the verdict.

IT IS SO ORDERED.

BACA and FRANCHINI, JJ., concur.